**CYCLOPS CORPORATION, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 72–1122.

United States District Court, W. D. Pennsylvania.

Jan. 8, 1976.

1288

J. Richard Lauver, David L. Ketter, Pittsburgh, Pa., for plaintiff.

Thomas Daley, Asst. U. S. Atty., Pittsburgh, Pa., James W. Littlefield, Tax

Div., Dept. of Justice, Washington, D.C., for defendant.

## OPINION

SCALERA, District Judge.

The plaintiff, Cyclops Corporation, seeks judgment against the defendant, United States, for the refund of corporation income taxes for the calendar years 1962, 1963, 1964, 1965 and 1966, plus interest as provided by law. The issue is whether plaintiff, as an accrual basis taxpayer, is entitled to a current deduction in the calendar year in which it incurred obligations variously designated as contingent, delayed, and additional delayed obligations to contribute to trusts created under Supplemental Unemployment Benefit Plans. The Internal Revenue Service has disallowed all claimed deductions by plaintiff for the delayed obligations under the SUB plan and has allowed only those amounts which were actually paid into the SUB trusts.

## I

The complaint containing seven counts seeks a refund of corporate income taxes paid by plaintiff over a period of five years. The government's answer is a simple denial of the allegations of the complaint. A stipulation of facts, including exhibits, was filed, which stipulation contained most of the facts in this case. Pretrial statements were filed and a formal pretrial conference was held in addition to status conferences and informal pretrial conferences. A non-jury trial was held, at which testimony was taken and the record completed. Following the filing of the transcript of the trial, the parties filed briefs and, in addition, the plaintiff filed a reply brief. The parties also filed proposed conclusions of law and statements of fact based upon the stipulation and testimony.

In the appendix hereto is a statement of facts outlining in detail the provisions of the plans, the manner in which they operated, and the relevant facts of this controversy. The statement of facts, together with this opinion, shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), 28 U.S.C.

This case involves three separate corporations, three identical supplemental unemployment benefit plans, and the same issues which arose out of the same industry-wide supplemental unemployment benefit plan considered by the Tax Court of the United States in *Lukens Steel Co. v. Commissioner*, 52 T.C. 764 (1969), and by the Court of Appeals for the Third Circuit in *Lukens Steel Co. v. Commissioner*, 442 F.2d 1131 (3d Cir. 1971), which affirmed the Tax Court.

As in the *Lukens* case, Cyclops, and its predecessor companies, agreed with the Steelworkers Union to establish a supplemental unemployment benefit plan, the purpose of which was, as its title indicates, to supplement state unemployment benefits available to laid-off employees. The obligation of Cyclops under the plans consisted of current and deferred liabilities.

Under the contract between Cyclops and the Union, Cyclops, which has been consistently an accrual basis taxpayer, agreed to make payments to trust funds to provide supplemental unemployment benefit payments to its employees. A part of the payments to the trust was to be made in cash and a part was to be made at future times as the financial needs of the fund required and as specified by the various provisions of the fund. The amount of all of the payments to be made was determined by events occurring during the taxable years. The contracts in existence during the taxable years provided that any excess of the delayed and/or deferred payment obligations to the trusts over the actual amounts paid out to employees by the trusts should be used for other benefits to the employees and in no way could inure to the benefit of the employer.

All of the deferred and delayed obligations were accrued by the plaintiff as

business expenses and deducted by it in its returns for the years in which such credits were made. The amounts credited in this fashion during the taxable years would be paid ultimately to the employees under the provisions of the contract creating the trusts. There was, however, uncertainty during the taxable years with regard to the identity of the ultimate recipients of the benefits and the time of such payments.

The plaintiff claimed for each of the five years in suit as deductions its total obligations to the trusts, including its cash obligations and any deferred, delayed and future obligations under the plan. The plaintiff's position is that these are ordinary and necessary business expenses under section 162(a) of the Internal Revenue Code of 1954 (26 U.S.C.). The government's position is that the only proper deductions are those amounts which Cyclops paid into the trusts during each year in suit and that all other obligations, no matter how designated, are not deductible and therefore properly were disallowed.

## II

There is no dispute as to the basic legal principles involved in this case. Section 162(a) of the Internal Revenue Code of 1954, 26 U.S.C., permits the taxpayer to deduct an ordinary and necessary business expense.

■ There is no dispute as to the general rule for determining the particular taxable year in which a taxpayer is entitled to take a deduction. Section 461(a) of the Internal Revenue Code provides that deductions "shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Further, the treasury regulations provide that under the accrual method of accounting, deductions are allowable "for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Treas. Reg. 1.461–1(a)(2), 26 C.F.R. This regulation reflects the general rule, the "all events" test, which determines when an allowable deduction may be taken. This rule and its corollary, that the expenses are deductible only in the taxable year in which the absolute and unconditional obligation arises even though payment is not due until a subsequent year, has been repeatedly restated and approved. *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); *Aluminum Castings Co. v. Routzahn*, 282 U.S. 92, 51 S.Ct. 11, 75 L.Ed. 234 (1930).

## III

There is no disagreement between the parties that the SUB plan provisions and factual background involved in the *Lukens Steel Company* case are virtually identical to the provisions and factual background at issue in this case. Defendant concedes that the deductibility of obligations similar to the plaintiff's obligations in this case was considered and was allowed in *Lukens*.

The plaintiff submits that the Third Circuit's affirmance of the Tax Court decision is binding upon the court in this case. The plaintiff points out that the only substantive difference between the Lukens Company 1962 SUB plan, as described by the Tax Court in its opinion, 52 T.C. 764, and the Cyclops revised SUB plans is that the Lukens plan reflects a 52–53 week corporate fiscal year ending on the Saturday nearest December 31, whereas Cyclops reports on a calendar year basis. As the plaintiff points out, this is a very minor difference.

The Court of Appeals held that Lukens was entitled to deduct the monthly obligation under its 1962 SUB plan, including cash contributions and delayed obligations, in the taxable year incurred because sufficient events had occurred in that year "to fix the obligation to pay this liability in the form of cash." *Id.* at 1134. The court concluded that the deductible monthly obligation included the amount of the contingent liability carryforward from Lukens earlier SUB plan to its 1962 SUB plan and that the entire amount thereof was properly accruable

in its fiscal year 1962, being the year in which the contingent liability became non-cancellable.

It should be noted that the parties involved here have stipulated that the express terms of each of the revised SUB plans provide for the carry-forward of the full amount of the "contingent liability" under the three earlier SUB plans as part of the delayed contribution element of the monthly obligation on the respective effective dates of the revised SUB plans (i. e., July 1, 1962 in the case of Universal-Cyclops, and February 1, 1963 in the case of Empire-Reeves and Reeves Steel).

The Court of Appeals in *Lukens* rejected the Commissioner's arguments that the liability for the delayed obligation was wholly contingent, rather than fixed and certain, and therefore was not accruable until actually paid into the Lukens SUB trust.

The decisions of the United States Courts of Appeals, of course, are binding upon the District Courts within such Circuit. As Judge Weber said in *Minnich v. Nabuda*, 336 F.Supp. 769 (W.D.Pa.1972), while he "believes most strongly" in an opposite point of law, the District Court is nevertheless "bound by the current holding of this circuit." *Id.* at 770. In *Thompson v. United States*, 148 F.Supp. 910 (E.D.Pa.1957), involving a federal estate tax refund action, the District Court indicated that a "similar fact situation to that here involved" was recently considered in the Third Circuit, and that "that decision controls this case." *Id.* at 913. See also *Shoffner v. Glenshaw Glass Co.*, 173 F.Supp. 850, 854–855 (W.D.Pa.1959), and *Shupe v. Pennsylvania R. Co.*, 19 F.R.D. 144, 145 (W.D.Pa.1956).

The plaintiff and defendant have stipulated in this case that the 1962 revised SUB plans as adopted by Universal-Cyclops, Empire-Reeves, and Reeves Steel were substantially in the same form as the 1962 SUB plan developed by the steel industry and Union negotiators during the 1962 steel industry labor negotiations and adopted by the major steel companies. The 1962 SUB plan litigated in *Lukens* was also in the same form developed in the 1962 steel industry negotiations and adopted by the major steel companies. 52 T.C. at 766–767. The Tax Court's findings of fact in *Lukens*, 52 T.C. at 765–781, are virtually identical to the stipulation of facts between the parties in this case aside from the amounts of the monthly obligations.

In summary, the government's effort to persuade this court to either consider *Lukens, supra,* to be in error or to distinguish *Lukens* from this case are not successful.

## IV

The government argues that, while it is "fully aware that the deductibility of obligations similar to the plaintiff's was considered and allowed" in the *Lukens* case, both the Tax Court and the Appellate Court were "in error in deciding *Lukens,* not because of any misunderstanding regarding the principles controlling the timing of deductions under section 461 of the Code, but rather because the courts did not first analyze under section 162 the nature of the obligations for which the taxpayer was seeking a deduction." [1]

This argument of the government appears to be an effort to distinguish between the obligation to pay money to the trusts and an obligation to pay the benefits provided under the SUB plans directly to the employee. As the government states:

. . . plaintiff's undertaking to pay money to a trust are (sic) not, when considered *in vaccuo,* ordinary and necessary business expenses.[2]

In argument at various times in this case the government labeled this proposition as the distinction that must be made between the form, i. e., the trust, and the substance, i. e., the obligation to pay the employee benefits.

1. Government's brief, p. 40.

2. Government's brief, p. 38.

■ The government has presented no authority to support the contention that the obligation to pay money to an entity such as a trust, in itself would not properly be a deductible expense under section 162. This argument is not persuasive as it appears, as plaintiff has argued, that such a position amounts to an attack on the accrual method of accounting.

V

The government, in addition to its claim that the *Lukens* decisions were in error, attempts to distinguish this case from *Lukens* in two respects.

The first effort to distinguish *Lukens* from this case would be best set forth by quoting from the government's brief:[3]

The defendant does not deny that the plaintiff has, for the purpose of paying specified employee benefits, committed itself to establish unfunded liability accounts in amounts determinable within the year for which deductions are sought. The defendant also acknowledges that it was this very obligation for which deductions were allowed in *Lukens, supra*, but the Court should note that this was only after the Tax Court had concluded . . . that such obligation "does not depend upon an estimate of anticipated future expenditures." Whether such a conclusion be considered a finding of fact or a conclusion of law, it is totally devoid of support in this case. . . Without this intermediate finding, the ultimate conclusion of the Court is simply not helpful to the resolution of the matter in the instant case.

The government does not indicate what the quoted phrase from the Tax Court's 23-page opinion in *Lukens* meant in connection with the Tax Court's decision. The plaintiff notes that the Court of Appeals in its opinion in *Lukens* ignored the statement of the Tax Court.

It is clear that in this case the accrual of the monthly obligation was fixed by the terms of the SUB plans themselves and did not depend on estimated or anticipated future expenditures. Cyclops has incurred a fixed and absolute liability under the SUB plans. The future disbursement of benefits under those plans does not alter the obligation.

The government secondly attempts to distinguish this case from *Lukens* by arguing that in *Lukens* the court(s) found that the obligation once incurred could not be extinguished, reduced, or cancelled, or in any other manner revert to the benefit of the company. The government suggests that the opposite must be found in this case because in 1968 Cyclops by agreement with the Union cancelled $183,000 of the obligations accumulated during the years under consideration and indeed claimed a deduction on this amount.

The provisions of the industry-wide SUB plan and S & V plan which give rise to the "evaporation" in this case were before the Court of Appeals in *Lukens, supra*. These provisions were summarized in paragraph 72 of the stipulation filed in this case (and are described in the appendix to this opinion) as follows:

Under Section 15.0 of the 1964 Universal-Cyclops S & V Plan, Universal-Cyclops incurred a liability to pay 12.5 cents per hour worked to the FAA. . . . Under Section 15.2b of said S & V Plan, the maximum hourly accrual to the FAA was 15.625 cents per hour worked, 3.125 cents of which was in the form of spillover from the 1962 Universal-Cyclops SUB plan. . . . However, Section 15.9 of said S & V Plan provided for a maximum cumulative monthly accrual of additional delayed contributions, including splashback, in the amount of 3.5 cents per hour worked, less any spillovers to the said S & V Plan. The difference between the maximum available "spillover" of 4.5 cents per hour worked set forth in Section 15.1 of the said S & V Plan and said maximum monthly accrual of 3.5 cents as set forth in Section 15.9a of the said S & V Plan was

3. Government's brief, p. 42.

commonly referred to as "evaporation."

Notwithstanding the 3.5 cent limitation in the S & V plan, the maximum 4.5 cent SUB accrual under the appendix to the SUB plan continued in full force and effect. Under these provisions, the full amount of the additional delayed contribution (up to 4.5 cents) continued to be incurred without regard to the S & V plan limitations. During each of the years from 1964 through 1967, plaintiff accrued and deducted the additional delayed contribution required under the 1962 SUB plan. Once a fixed and absolute obligation of the plaintiff, the additional delayed contribution (including the amount ultimately labeled "evaporation") could only be used for the payment of unemployment benefits or possible transfer in future years to the S & V plan if needed to pay S & V benefits.

The plaintiff, consistently having utilized the accrual method of accounting, was required to accrue and deduct its full SUB liability in each of the calendar years in which it was incurred; otherwise, its income would be distorted. As stated by the Supreme Court in *United States v. Consolidated Edison Co.*, 366 U.S. 380, 384–385, 81 S.Ct. 1326, 1329, 6 L.Ed.2d 356 (1961):

> It is settled that each "taxable year" must be treated as a separate unit, and all items . . . must be reflected in terms of their posture at the close of such year. . . . And the parties agree that, under the applicable federal [income tax] statutes, neither the Government nor an accrual-basis taxpayer may cause an item to be deducted in a year other than the one in which it accrued.

(Citations and footnotes omitted).

The same rule had been stated earlier by the Supreme Court in *Security Flour Mills Co. v. Comm'r*, 321 U.S. 281, 285–286, 64 S.Ct. 596, 598, 88 L.Ed. 725 (1944):

> . . . [T]he well understood and consistently applied doctrine that cash receipts or matured accounts due on the one hand, and cash payments. or accrued definite obligations on the other, should not be taken out of the annual accounting system and, for the benefit of the Government or the taxpayer, treated on a basis which is neither a cash basis nor an accrual basis, because so to do would, in a given instance, work a supposedly more equitable result to the Government or to the taxpayer.

Under this authority, the plaintiff did accrue and deduct its full SUB liability under the plans because "all events" had accrued in each of the four years to establish and fix the amount of that liability.

■ An item properly accrued under the "all events" test may in some later year, because of changed circumstances, lose its character as a fixed and absolute liability. In such a case, an accrual basis taxpayer is required to include the item in income in the later year to the extent it had received an earlier tax benefit. See Regulations, § 1.111–1(a), 26 C.F.R.

■ This occurred in the case of the cancellation of the "evaporation" in 1968. The Union and Cyclops agreed in 1968 that the 1 cent differential (which could produce "evaporation" under certain circumstances) should not accrue thereafter as an additional delayed contribution in light of the provisions of the 1964 S & V plan, and, further, agreed to cancel the "evaporation" amount which had already built up in the amount of $183,000.[4] This action by the plaintiff and the Union in 1968 by separate and subsequent agreement in no measure affects the proper accruability of the full SUB liability incurred under the plans in earlier years.

That the accrual of a fixed and certain liability in one taxable year is not al-

---

**4.** The plaintiff in its 1968 federal income tax return reflected the $183,000 on Schedule M thereof, a proper treatment since the original deduction therefor had been disallowed by the revenue agent with the resulting denial of any tax benefit.

tered by changes occurring in a subsequent taxable year was emphasized in *Rath Packing Co. v. Bacon*, 255 F.Supp. 809 (S.D.Iowa 1966). The company and union had initially agreed to establish a committee to study certain problems in connection with the expenditure of moneys being accrued in an automation fund. In a later year, the company and union agreed that the committee should not be appointed, but it was held nevertheless that this subsequent event did not alter the fixed and absolute liability which existed under the labor agreement in the earlier year of accrual. The court rejected the same argument now being advanced by the government in this case by stating that:

> . . . [T]he subsequent turn of events did not affect the liability incurred by the taxpayer to contribute to the Fund during the years in question. The taxpayer's obligation to establish the Fund was fixed by the contract. The deductions must be viewed in light of the circumstances existing when the contract obligation was incurred. *Id.* at 812.

That same result was also reached recently by the Commissioner in Rev.Rul. 72–489, 1972–2 Cum.Bull. 89, involving deductions for contributions to an industry-wide wage supplementation plan. Under the formula used in that plan for calculating employer costs, certain distortions of the true employer cost could occur. These true costs did not become known, however, until after the end of the calendar year. Thus, in any given year an accrual basis employer might have deducted more than its true liability. The Commissioner ruled that the events which occurred in a subsequent taxable year did not affect the earlier accrual and, further, stated that:

> In instances where other employers receive amounts from the administrator representing their incurred costs under the Plan that is in excess of their respective pro rata share of the total industry cost, such amounts, to the extent that a tax benefit was received in

a prior taxable year, are includable in their gross income in the year of recovery.

## VI

The government next argues that "all the events which establish a deductible liability with certainty have not occurred" in this case.[5] The government maintains that although the plaintiff has committed itself to pay particular employee benefits under the terms of the SUB plans in future years, there is no certainty that the events giving rise to the payment of the benefits, "i.e., individuals in the continuous employ of the plaintiff for at least two years being laid off during periods of total or partial unemployment, will occur."[6]

In support of this argument, the defendant cites *Brown v. Helvering*, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934), in which the Supreme Court denied a deduction for amounts which the taxpayer would be required to pay if and when any of its insurance policies were cancelled, the rationale of the court being that there was not a proper deduction because the liability for expected future cancellations was not fixed and absolute. The facts of *Brown* are not similar to the facts of this case.

■ In *Lukens*, the Court of Appeals found that sufficient events occurred during the years in question to make the delayed obligation absolute and irrevocable. The court discussed several reasons for its decision, all of which are equally germane to this action.

First, the court looked to the provisions of the 1962 SUB plan which determine the fact and amount of the employer's liability to make contributions into the SUB trusts. These provisions state that it is the rendition of services, hour by hour, by the employees represented by the Union which gives rise to the obligation and determines its amount. By virtue of these provisions, the court stated at page 1134 that: "once earned, the money was committed to inure to

---

**5.** Post-trial brief of defendant, p. 36.

**6.** Post-trial brief of defendant, p. 39.

the benefit of the eligible members of the Steelworkers Union" and further stated at page 1135 that: "At the end of [Lukens'] fiscal year, the amount of liability is determined by events which happened during the year."

Plaintiff's liability, as was Lukens', for the monthly obligation incurred under the revised SUB plans, was simply one of several elements in its overall hourly wage cost. In reality, the 9.5 cents maximum monthly obligation per hour worked is no different than the basic hourly wage paid to employees or any of the other fringe benefits provided under the basic labor agreement. Upon the completion of one hour's work, the plaintiff became absolutely and unconditionally committed to expend the full amount of the monthly obligation incurred, without any distinction between cash contribution or delayed obligation, for the sole and exclusive benefit of its employees. The SUB plan in no manner conditions this absolute commitment on employee layoffs or any other event.

After initially determining that the performance of services by the eligible employees triggered the liability and amount of the liability, the Court of Appeals next determined that the liability once incurred could not be cancelled. The court noted the non-cancellability feature of the delayed obligation on page 1134: "It was not possible for Lukens to cancel the contingent liability account without paying it to the Union." It then noted that the delayed obligation could not be cancelled even in the event of termination of the SUB plan or of shut-down of Lukens' operations:

> The amount credited to the contingent liability [i.e., delayed obligation] would always be potentially available to Lukens' eligible employees. In no event could the contingent liability be cancelled by Lukens, actually it was the latter's fixed and absolute liability and the only uncertainty pertaining to it was the time of payment. *Id.* at 1135.

The express and unambiguous provisions of the 1962 SUB plan provide that upon termination of the plan, all the assets in the trust funds, including the delayed obligation, shall be used until exhausted to pay unemployment benefits to employees. In the remote chance that the trust funds would not be used to pay unemployment benefits, the funds would be used in a manner designed to promote the purposes of the plan. Moreover, each of the trust agreements between Universal-Cyclops, Empire-Reeves, and Reeves Steel and the respective corporate trustees provides that none of the assets of the trust funds shall at any time be used for, or diverted to, purposes other than for the exclusive benefit of employees and their beneficiaries under the plan.

Vincent L. Matera, one of the principal negotiators, drafters and interpreters of the SUB plans since their inception in 1956, testified that it was intended that the 1962 settlement agreement was to provide explicitly that all the contingent liabilities would become non-cancellable under any and all future circumstances.

## VII

The government argues that the plaintiff's obligations to provide for specified employee benefits have not been determined with reasonable accuracy. In elaborating upon this point, the government assumes for the sake of argument that the plaintiff's commitment to contribute funds for the benefits specified in the SUB plans is certain. The government, however, urges that the plaintiff, to qualify for the deduction, must in addition establish that the amount of such commitment can and has been determined with reasonable accuracy.

The government, in support of its proposition, asserts that the SUB plans were so structured as to create a built-in reserve. It contends that the $488,975.60 of contingent liability carried forward in 1962 under the revised plan was intended initially to provide this reserve. The government concludes that because the reserve's continuing existence was necessary to insure the desired operation of

the plans, i.e., the payment of 100 percent of benefits, the amount of the reserve was never intended to be paid out.

The government attempts to show by a table in its brief the pay-out of the contingent liability carry-forward under the 1962 Universal-Cyclops SUB plan. It notes that this table indicates that the annual amount of plaintiff's obligation is more than sufficient, matched to the actual needs of the employees' trusts, to avoid any significant resort to the initially assumed reserve.

Finally, the government argues that the relationship between the delayed contribution and the additional delayed contribution is evidence that the accrual of the additional delayed contribution was excessive and beyond what could be considered a reasonable estimate of anticipated expenses.

However, as the plaintiff has correctly pointed out, the 1962 carry-forward of the contingent liability was before both the Tax Court and the Court of Appeals in *Lukens*, and explicitly accepted as part of the delayed contribution. And, as settled in *Lukens*, the monthly obligation was properly accruable and deductible under section 162 of the Code because it was a fixed and certain liability, rather than a mere estimate of anticipated expenses.

## VIII

The next proposition advanced by the government is that "the facts existent at the time of accrual do not establish that it was probable and that the parties anticipated that the obligations would be paid in a reasonable period of time."[7]

The government in this portion of its argument noted that in *Lukens* there was evidence to the effect that the parties reasonably anticipated that the money represented by the liability accounts would be paid out in a relatively short time. The government maintains that there is no evidence in this case to support a finding similar to that of the *Lukens* courts.

 The government is inaccurate. The Court of Appeals for the Third Circuit held in *Lukens* that the taxpayer could accrue the delayed obligation in the year incurred even though the date of payment of the unemployment benefits was not definite. Furthermore, it has been uniformly held that an uncertain date of payment of an accrued liability does not materially affect the application of the "all events" test of *United States v. Anderson, supra*. Before *Lukens*, the principle that a fixed obligation is currently accruable even though the ultimate date of payment is indeterminate most recently received expression in *Washington Post Co. v. United States*, 405 F.2d 1279, 186 Ct.Cl. 528 (1969), and in *Rath Packing Co. v. Bacon*, 255 F.Supp. 809 (S.D.Iowa 1966).[8]

---

7. Post-trial brief of defendant, p. 51.

8. In *Washington Post*, the taxpayer each year contributed a designated share of its net profits to a Circulation Dealer Incentive Plan. The portion of the Post's annual contribution allocated to each dealer was payable in full when the dealer's contract was terminated by reason of his having become a Post employee or when, while still under contract, he died, became disabled or reached age 55. If a dealer's contract were terminated for any other reason, he would receive up to 70 percent of the sum allocated to his account and the balance, the so-called "non-vested" portion, would be reallocated among the remaining dealers participating in the plan, to be paid to the latter when, and if, they so qualified. The time at which the non-vested portion would be paid was indeterminate in that it depended upon the Post's subsequent dealer turn-over experience. The Commissioner contended that the "non-vested" portion of the Post's obligation was a "contingent liability" which did not satisfy the "all events" test, and that it was not currently accruable because (i) the time of payment (as well as the identity of the beneficiaries) could not be ascertained during the year of accrual, and (ii) the obligation might never actually be paid. The Court of Claims rejected the Commissioner's first contention with the following explanation at page 1283:

"So we view this Plan for what it functionally is: a continuing liability on the part of the Post to compensate a group of dealers, the amount of compensation being fixed as of the end of each fiscal year, but the ultimate

There are several cases holding that an accrual basis taxpayer need not have even a reasonable expectation at the time of the liability's accrual that the liability will in fact be paid. *Keebey's Inc. v. Paschal*, 188 F.2d 113 (8th Cir. 1951); *Grand Avenue Motor Co. v. United States*, 124 F.Supp. 423 (D.C.Minn. 1954); and *Jenkins Wright Co., Inc.*, B.T.A. Memo. Dec. 12, 255–6 (1942). It is, of course, now beyond question that mere uncertainty as to the time of the payment is immaterial under the "all events" test. The 1962 SUB plan was designed to provide for a payment of the delayed obligation within a reasonable time after accrual and plaintiff's delayed obligation under the 1962 revised SUB plans actually was paid out within a few years of its accrual.

The Court of Appeals in *Lukens* focused on the substance of the matter. The court examined the negotiation history of the 1962 SUB plan and the actual plan provisions to determine the intention and expectation of the companies respecting the use of the delayed obligation.

The court noted that the 1962 SUB plan financing provisions were carefully worked out on the basis of a comprehensive statistical analysis of relevant cost factors and unemployment experience.

The cost of funding the plan was not arbitrarily determined, a group of experts on economics and statistics was selected by the steel companies and the Union to deal with the problem. In the light of their analysis, the negotiators concluded that a contribution rate of 9.5 cents per hour would be required to provide the agreed upon SUB Plan benefits. The amount actually disbursed to the Trust Fund in cash and immediately available for distribution was less than one half of the amount the experts felt was needed, the balance was to be in [the] contingent liability account. As a result of this arrangement it was anticipated that the Plan would be funded exclu-

recipients, and the time of actual payout, undetermined, at least in part. We think the indeterminacy involved [with respect to the time of payment] does not make the liability any less real, or any less fixed. . . ." With respect to uncertainty of payment itself, the Court of Claims added at page 1284:

". . . [T]he 'all events' test that comes down to us from *United States v. Anderson*, supra, is not inflexible; . when the liability itself is clearly fixed, as in this case, other uncertainties do not necessarily destroy that initial certainty."

The Court of Claims also chided the government for its two theories on the construction of the "all events" test by stating at page 1283 that

"[Neither theory] takes account of the one overriding reality in this case: plaintiff is irrevocably bound to pay whatever it accrues to the Fund, and this amount is definitely fixed as of the time of accrual."

In *Rath Packing Co., supra*, the taxpayer, as a result of collective bargaining negotiations with its union, obligated itself to contribute to an "Automation Fund" an amount equal to one cent for each hundredweight of meat products shipped from its plant. The sums for which taxpayer obligated itself were to be "credited" currently. on its books of account, and were to be expended at an undesignated future time, in accordance with the recommen- dations of a joint company-union committee, for the purpose of studying and developing a program designed to alleviate the problems resulting from automation in the industry. If the entire amount credited to the "Automation Fund" were not expended for the designated purpose, the taxpayer and the union were to agree to a procedure for disposing of the balance. The taxpayer sought to accrue deductions for these sums at the time its obligation arose—when meat products were shipped from its plant—but the government contended that deductions were not allowable until such time as the expenditures were actually made. In so contending, the government relied on the facts that the taxpayer was permitted to commingle the sums earmarked for the "Automation Fund" with its general funds; that the joint union-company committee authorized to make expenditures had never been appointed; that there had been no actual pay-outs from the fund in the tax years involved, and that no method had been prescribed for disposal of the balance of the fund. These facts notwithstanding, the District Court, emphasizing the fixed character of the obligation, held that the taxpayer was entitled to accrue the expense as meat products were shipped from its plant; the fact that payment was deferred until an undesignated future date was deemed to be immaterial.

sively with contingent liability within a few years after it was in effect . . . .

The SUB Plan was designed so that even if the experts were wrong, and the contingent liability was not needed, the remaining assets including contingent liability were to be used to pay benefits to Lukens' eligible employees, either at the termination of the Plan or of the Company. The amount credited to the contingent liability would always be potentially available to Lukens' eligible employees. *Id.* at 1134.

From the stipulation of facts entered into by the parties in this case, including comprehensive and detailed schedules showing essentially all accruals by Cyclops under the revised SUB plan and all payments from the SUB trusts in the form of unemployment benefits, and further showing the computation, month by month, of the derivation of the accruals for the monthly obligation with references to the applicable sections of the plan itself, little more needs to be said concerning the virtual certainty of full payment of the delayed obligation to eligible employees within a reasonable period of time.

A brief summary of the 1962 labor negotiations and the relevant portions of the 1962 SUB plan in the appendix indicates the overwhelming nature of the evidence relating to the reasonableness of the period of payments.

The parties have stipulated that Cyclops, in accordance with the accepted practice in the industry, had no practical alternative but to accept the terms of the 1962 SUB plan which were negotiated by the major steel companies and the Union. Plaintiff had maintained a record of its own layoff experience since at least 1956 following the original adoption of the SUB plan and regularly reported the relevant data to the Union; was privy to the proposals under consideration in the 1962 joint negotiations and most certainly was cognizant of the cyclical nature of unemployment in the steel industry by virtue of its substantial payments of unemployment benefits between 1956 and 1962 under the 1956 SUB plan. Further, indicating its cognizance of absolute liability, plaintiff consistently carried its entire unpaid delayed obligation as an accrued expense and/or accrued liability on its books of account, in its published financial statements and in reports filed with the Securities and Exchange Commission. See *Ohmer Register Co. v. Comm'r.*, 131 F.2d 682 (6th Cir. 1942).

The Court of Appeals said in *Lukens* that it was anticipated that the delayed obligation would be paid in a reasonable period of time. This statement was based on a finding by the Tax Court that "Lukens intended, and reasonably expected, that its entire contingent liability under the 1962 SUB plan as in effect during the years at issue would be paid." 52 T.C. at 781. The Tax Court made a further finding, which the Court of Appeals cited in its opinion at page 1134, that the cash assets of the Lukens SUB trust were entirely exhausted as of December 31, 1963 through the payment of unemployment benefits and that any further payments from the trust would be financed from the "Contingent Liability" account. 52 T.C. at 778, 780.

The Tax Court in its opinion said that both Lukens and the union "reasonably anticipated that the amounts credited by petitioner to the plan as contingent liabilities during the taxable years would be required, on a 'first-in first-out' approach, to be paid by the petitioner to the trust within a few years." 52 T.C. at 785.

Chief Judge Hastie, concurring in *Lukens*, stated:

The Tax Court found that it was probable and was reasonably anticipated by the parties that the sums the taxpayer irretrievably committed to the Supplemental Unemployment Benefit Fund during the taxable years would have to be paid out within a relatively short time that could be estimated approximately. That finding makes it unnecessary to decide whether sums

committed to such a fund as this are then immediately deductible as an accrued business expense if the time of future disbursement is entirely speculative and is as likely to occur decades hence as in the near future. Yet the opinion of the Court seems broad enough to cover that situation. I prefer not to express any opinion whether an immediate deduction would have been allowable in such a case. *Id.* at 1135–36.

In this case, even the more stringent test suggested by Judge Hastie's concurring opinion is satisfied. Plaintiff's payouts cannot occur "decades hence"[9] since a substantial part of the delayed obligation has already been paid by plaintiff in the form of unemployment and related benefits.

This case involves five calendar years, (1962 through 1966) and another six years elapsed before the institution of this action in December 1972, hence it is not necessary to speculate on the length of the deferral period. The evidence of what has happened since 1962 is in the record.

First, the parties have stipulated that beginning with the month of September 1962, *all* unemployment benefits payable thereafter by Universal-Cyclops under the 1962 Universal-Cyclops SUB plan from its SUB trust were financed solely through the delayed obligation and *none* was financed through current contributions. (Stip. X 28.) Moreover, the parties have stipulated that *all* unemployment benefits payable by Empire-Reeves under its 1962 Empire-Reeves SUB plan from and after its effective date on February 1, 1963 were financed solely through the delayed obligation. (Stip. X 32.) Thus, in both cases, the intention of the drafters of the 1962 SUB plan that full funding of benefits thereunder would be in the form of delayed obligation within several years after its effective date (see 442 F.2d at 1133) was greatly overestimated, at least as applied to plaintiff. This fact makes doubtful

any argument that the creation of the delayed obligation was a device to obtain current tax deductions from an obligation which might never be payable.

The delayed obligation was in fact used almost immediately for the payment of unemployment benefits by plaintiff. Inquiry must turn to the length of time of the payment of the delayed obligation to see if the actual payments by plaintiff satisfy Judge Hastie's more severe test that payment should not occur "decades hence." Utilizing the first-in first-out method of accounting expressly authorized by the Tax Court in *Lukens*, 52 T.C. at 785, and based upon actual cash contributions by Universal-Cyclops into its SUB trust for the purpose of financing unemployment benefits, the delayed obligation accrued under the 1962 Universal-Cyclops SUB plan between July 1, 1962 and December 31, 1970 was completely paid out over the following periods:

| Year of Accrual | Year of Final Payment | Total Elapsed Years |
|---|---|---|
| 1962 (June 30 carry-forward) | 1967 | 5 |
| 1962 (July 1–Dec. 31) | 1968 | 6 |
| 1963 | 1970 | 7 |
| 1964 | 1970 | 6 |
| 1965 | 1971 | 6 |
| 1966 | N/A | N/A |
| 1967 | 1971 | 4 |
| 1968 | 1971 | 3 |
| 1969 | 1971 | 2 |
| 1970 | 1972 | 2 |

If, however, the elapsed years are weighted to reflect the percentage of cash contributions made by Universal-Cyclops to the SUB trust made in each of the years of payment, the delayed obligation was completely paid out over the following periods:

| Year of Accrual | Total Elapsed Years |
|---|---|
| 1962 (June 30 carry-forward) | 3.05 |
| 1962 (July 1–Dec. 31) | 5.74 |
| 1963 | 6.00 |
| 1964 | 6.00 |
| 1965 | 5.39 |
| 1966 | N/A |
| 1967 | 4.00 |
| 1968 | 3.00 |
| 1969 | 2.00 |
| 1970 | 1.01 |

**9.** The period of deferral permitted in *Helvering v. Union Pacific Co.*, 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363 (1934), was over 90 years.

Thus, over a total accrual period of nine years, including the five calendar years involved in this action, the longest elapsed period of time to pay out any given year's accrual of delayed contribution was seven years, while the shortest period was only two years. This supports the notion of plaintiff's compliance with both the opinion of the Court of Appeals in *Lukens* and Judge Hastie's concurring opinion concerning the period of payout.

## IX

The government lastly argues that the plaintiff's savings and vacation plans are deferred compensation plans and that deductions available for benefits under such plans are controlled by section 404 of the Internal Revenue Code, not section 162. It contends that the savings and vacation plans defer the receipt of compensation, since Cyclops' obligations under the SUB plans can be used in part to pay benefits under the savings and vacation plans, thus benefits under those plans are deductible only in the year when actually paid.

Defendant's argument relies on several allegations. First, that the S & V plans, at least in part, have the effect of deferring the receipt of compensation and, therefore, the allowance of deductions to the plaintiff for contributions to those S & V plans is governed by section 404. Second, that the additional delayed contributions under the revised SUB plans under certain circumstances may be transferred to the S & V plans for the payment of savings and vacation benefits. Third, that all, or some part, of the amounts accrued by plaintiff as additional delayed contributions under the revised SUB plans are claimed as deductions for tax purposes under section 162, which is improper because some undetermined amount thereof is deductible under section 404 only, at least to the extent such amounts in the year accrued were not either paid out in employee benefits or made non-forfeitable.

The plaintiff responds to each of the government's arguments. First, plain-tiff argues that whether or not the S & V plans have the effect of deferring the receipt of compensation is irrelevant. It argues that this case involves only the deductibility of its annual accruals under the revised SUB plans. The accruals were claimed as deductions under section 162 of the Code as ordinary and necessary business expenses. The plaintiff asserts that defendant does not, and indeed could not, argue that the revised SUB plans are plans deferring the receipt of compensation as described in section 404 of the Code. In order to establish the required nexus with a section 404 plan, therefore the defendant points to the S & V plans.

There is no dispute over plaintiff's claimed deductions of the amount of its payments or accruals during the relevant years under the S & V plans. The government never disallowed claimed deductions under either sections 162 or 404 of plaintiff's obligations arising under the S & V plans.

The defendant seeks to apply section 404 limitations to a section 162 plan even though all claimed deductions under the section 404 plan have been allowed in full.

The SUB plans and S & V plans are separate, distinct and totally different plans arising out of collective bargaining with the Union. Whereas the industry-wide SUB plan was first adopted in 1956, the S & V plan did not become effective until 1962. The SUB plan supplemented state unemployment benefits, while the S & V plan essentially and primarily provided vacations to eligible employees. All unemployment benefits were paid from the SUB trusts. All vacation benefits paid under the S & V plans were paid directly by the plaintiff to the employees. Only a small part of the total S & V plan benefits were paid through separate S & V trust funds.

The characterization of the 1964 S & V plan as a section 404 plan by the government thus must rest on two propositions. First, on the so-called "retirement benefits" feature which more cor-

rectly constitutes nothing but an extended vacation benefit payment accelerated to coincide with an employee's retirement. Second, on the notion that the savings option was, except for the year 1964 when it was not an option for senior group employees, non-existent in actual practice. The defendant argues that these remote connections taint the proper deductions of additional delayed contributions under the separate SUB plans of some unknown amount between $1,296,689 and $246,053. The argument is not persuasive.

Plaintiff secondly points out that defendant's argument is grounded on a misunderstanding or misinterpretation of the inter-related financing provisions of the S & V plans and revised SUB plans.

Much of the defendant's argument is predicated on the same theory used by the Commissioner in disallowing the original deductions claimed for additional delayed contributions under the SUB plans. It appears that the Commissioner failed to understand that the SUB plans and S & V plans are separate and distinct, such with its own funding and benefit provisions. In large part, the S & V plans were financed on a current cash basis, with virtually all accrued benefits paid out in cash during each year. Payments of benefits under the SUB plans were made during periods of unemployment which do not necessarily occur during each calendar year.

## X

Plaintiff vigorously argues that the defendant may not in its post-trial brief raise for the first time a new issue relating to the plaintiff's savings and vacation plans. The plaintiff contends that the argument that plaintiff's savings and vacation plans are deferred compensation plans and that deductions for obligations thereunder are controlled by section 404 of the Code rather than section 162 is not properly before this court and should not be considered.

Plaintiff urges that to permit any party in litigation, particularly in cases such as the one at bar where the issues are clear cut and the facts are carefully drafted by both parties in a 47-page stipulation, to raise an entirely new issue *after* (i) the pleadings are closed, (ii) the broad and virtually unlimited discovery procedures are completed, (iii) the pretrial narrative statements are filed, (iv) the pretrial conference is completed, and (v) the trial itself is consummated, violates the precepts of fairness and "even-handed justice."

The complaint in this case, containing seven counts, sought a refund of corporate income taxes paid by plaintiff over a period of five years. For each of those five years plaintiff claimed a deduction as an ordinary and necessary business expense under section 162 of the Code for the total monthly obligations, including the delayed contribution and additional delayed contribution, accrued under the 1962 revised SUB plans. No deduction for any of these amounts was ever claimed under section 404. The defendant's answer simply denied plaintiff's allegations relating to the proper deductibility of such amounts under section 162. No mention of the alleged applicability of section 404 appeared in the defendant's answer. Section 404 is never mentioned in the stipulation of facts or in any of the exhibits prepared specifically for this case.

Throughout this entire period, the court understood that the sole issue was whether the accrual of the delayed contributions under section 162 met the "all events" test as enunciated by the Court of Appeals in *Lukens, supra.* This belief was based on the defendant's answer, the stipulation of facts, the defendant's pretrial statement and the complete absence of any suggestion by defendant's counsel at the formal pretrial conference and in the other conferences that the government would raise a section 404 issue. Perhaps even those omissions might not have been prejudicial if the defendant had revealed at the trial its argument with respect to section 404. Although the defendant had ample op-

portunity to raise section 404 during the trial, it did not. For the first time, the government's argument appears in its post-trial brief.

■ While claims for refunds are not governed by common law pleadings, e.g., *Crook v. United States*, 135 F.Supp. 242, 249–250 (W.D.Pa.1955), and it is well-established that equitable principles govern defenses to tax refund suits, *Stone v. White*, 301 U.S. 532, 51 S.Ct. 851, 81 L.Ed. 1265 (1937), nevertheless, the rudimentary notice requirements of the Federal Rules of Civil Procedure, 28 U.S.C., apply.[10]

Understandably, there are few reported cases on this principle. However, in *Budd Co. v. United States*, 19 F.R.D. 346 (E.D.Pa.1956), Judge Van Dusen had occasion to review the general applicability of the Federal Rules of Civil Procedure in the context of a tax refund suit. There the defendant, before the trial, filed a motion for leave to file a second amended answer, essentially seeking to add a defense that a net operating loss sought to be carried forward should be eliminated by credit against taxpayer's excess profits tax liabilities from a prior year and to demand a refund of that year's excess profits tax. The government's first answer had specifically denied the allegations in the refund claim and denied other allegations in the complaint. The court stated:

It is quite clear that the defendant does not deny all the figures shown in

the refund claim and it is well recognized that the abovementioned rule [Fed.R.Civ.Proc. 8(b)] requires the defendant to give the plaintiff notice of the defenses which it shall be called upon to meet. *Id.* at 348 (footnote omitted).

The court addressed itself to the relationship between the *Stone v. White* doctrine of equitable defenses and the Federal Rules of Civil Procedure,[11] and concluded that the right of the government to invoke equitable defenses in a refund suit must give way to the basic notice requirements of the Federal Rules and therefore denied the government's motion, with leave to renew the motion at a subsequent hearing.

Obviously, such a ruling as in *Budd* is not possible in the instant case because the trial is over. The manifold prejudice to plaintiff cannot be cured at this late date. Had the government, prior to trial, made known its intention to raise the section 404 issue, plaintiff would have been able to seek additional fact stipulations bearing on the issue or at least would have offered additional testimony.

The matter of timeliness of raising a new issue in a refund suit also was raised in *Purnell v. United States*, 332 F.Supp. 65 (W.D.Pa.1971). There, the government argued that the claim for refund was insufficient to raise the question of the amount of deduction allowable for a certain debt. Judge Knox acknowledged that the claim for refund

---

**10.** Fed.R.Civ.P. 8(b) provides in part as follows:

"(b) Defenses; Form of Denials. A party shall state in short and plain terms his defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies. If he is without knowledge or information sufficient to form a belief as to the truth of an averment, he shall so state and this has the effect of a denial. Denials shall fairly meet the substance of the averments denied."

**11.** "The fact that the defendant may defeat a suit for refund of taxes by any state of facts creating equitable rights in its favor [citing *Stone v. White, supra*, and other cases] . . . does not relieve it of giving plaintiff adequate

written notice of its position in accordance with the terms of the Federal Rules of Civil Procedure. Also, it is noted that F.R.Civ.P. 9(c) requires that a denial of an occurrence, constituting a condition precedent to the claim, shall be made specifically and with particularity. The amount of the taxable income for the year in question is certainly an occurrence which is similar to a condition precedent in bringing any action for refund of federal income taxes and, where the defendant claims, in effect, an increase in this taxable income by amounts in excess of six million dollars, a statement denying all the plaintiff's computations showing taxable income is not a denial of the occurrence of the taxable income 'specifically and with particularity.'" *Id.* at 348–349, n. 6.

was somewhat vague, but observed that the controlling point is whether the Commissioner's attention has been focused upon the events of the case,[12] and held that the government was barred from raising the issue because:

> In any event, the government did not raise the question of the adequacy of the claim for refund in its answer to the complaint or in the pretrial narrative statement and is thus procedurally barred from raising it at this time. *Id.* at 71.

The factual situation in the instant case is not dissimilar from that in *Purnell.* Neither the plaintiff nor the court was ever made aware of any contemplated argument involving section 404, although the government had full knowl-

edge of the existence of the savings and vacation plans and inter-related finances between those plans and the revised SUB plans.

■ This court agrees with plaintiff's contention.[13]

One of the major underlying factors the court must consider is the absence in the record of relevant evidence relating to the section 404 issue. There is, however, one relevant fact which is in the record and which therefore may be considered by the court. Contrary to all the inferences in Part II of defendant's post-trial brief, none of the additional delayed contribution, which was accrued by plaintiff as of December 31 of each taxable year during the period 1962 through 1966, exclusive of amounts actually

---

**12.** "There is no question here that the government knew exactly what the claimant was talking about. The matter was under litigation for approximately three years in the Pennsylvania courts during which time the government actively participated in the proceedings. The audit report on the refund claim dated May 10, 1967 (Exhibit 1) shows that the Internal Revenue Service clearly understood that the dispute was over the amount of assets received by Mrs. Purnell from her husband's estate or what deduction should be taken therefrom for the debtor-creditor relationship in calculating the federal estate tax in her estate." 332 F.Supp. at 71.

**13.** See also *Helvering v. Tex-Penn Oil Co.,* 300 U.S. 481, 498, 57 S.Ct. 569, 81 L.Ed. 755 (1937); *United States v. Samel Refining Corp.,* 461 F.2d 941, 943, n. 4 (3d Cir. 1972); *In Re Linda Coal and Supply Co.,* 255 F.2d 653, 656–657 (3d Cir. 1958).

The defendant's post-trial brief is silent on the issue of timeliness of raising the section 404 issue. In apparent anticipation of the plaintiff's objections, however, the defendant cites *Compton v. United States,* 334 F.2d 212 (4th Cir. 1964) and *Taylor v. Comm'r.,* 70 F.2d 619 (2d Cir. 1934), aff'd. sub nom., *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935), as authority for raising the section 404 issue at the post-trial level. However, there is no quarrel with the general proposition that the plaintiff in a refund suit has the burden of proof to establish the amount of its refund, and to do so must show that the income taxes have in fact been overpaid. Neither case touches on the crucial factor of timeliness involved here.

In *Compton,* the issue was whether the assessment giving rise to the refund suit was invalid because it was based on judicially determined illegally obtained evidence; the case cannot be cited as authority for the question involved here of due and timely notice. It does not appear that timeliness in raising issues was raised or argued by either party or was considered by the court.

*Taylor* was not a tax refund case, but was an appeal from an order of the Board of Tax Appeals sustaining a deficiency in the taxpayer's income tax. The substantive issue involved was the correct basis of certain preferred shares for calculating taxable gain. The case did not concern the timeliness issue presented to this court. Another point that must be mentioned concerning *Taylor* is that, after first noting that in a proceeding to review a tax deficiency the taxpayer has the burden of proving that the deficiency was erroneous, Judge Hand held that a taxpayer is not required to prove that he owes no tax or the precise amount of the tax due. Implicit in the opinion is the doctrine of fairness and due notice. The government, be it represented on the record by the Commissioner or otherwise, is bound by at least minimum standards of fairness.

In line with Judge Hand's opinion, the court does believe that defendant would strongly argue that it could seek an "offsetting adjustment" based on, for example, an alleged unreasonable compensation issue or excessive rental payments issue. Under such a theory the government would be free *at any time,* at least short of appellate review, to raise a new issue even if the statute of limitation would bar an independent assessment on that issue.

transferred or "spilled over" to the S & V plans during the taxable years, was ever used during those years and has not been used to date, for the payment of S & V plan benefits.[14] Thus, defendant's basic assumption that all the additional delayed contributions could have been used to pay benefits under the S & V plans is based on sheer speculation.

Defendant's section 404 issue must be rejected.

## XI

The defendant's attempt to raise a new issue under Section 404 is not only untimely, but is neither persuasive nor supported by the record. What is involved in this case is the proper deductibility of plaintiff's absolute and unconditional obligation under arms-length, industry-union negotiated supplemental unemployment benefit plans. All events had occurred in each of the years involved to fix the fact and amount of its liability and the amounts thereof were, under its method of accounting, properly accrued and deducted for tax purposes in the particular taxable year required by law.

In view of this court's conclusion based on the entire record, plaintiff is entitled to a judgment in its favor for refunds of corporate income taxes paid in each of the years 1962 to 1966, inclusive.

The parties are directed to calculate the amount to be recovered by plaintiff and to submit a proposed judgment in accordance with this opinion.

## APPENDIX

### STATEMENT OF FACTS

Universal-Cyclops Steel Corporation was a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. Empire-Reeves Steel Corporation was an Ohio corporation. Before April 30, 1965, Empire-Reeves operated plants at Mansfield, Ohio, and, through its Reeves Steel and Manufac-turing Division, at Dover, Ohio. On April 30, 1965, Empire-Reeves was merged into Universal-Cyclops and the name of the surviving corporation was changed to Cyclops Corporation. The former Universal-Cyclops became the Universal-Cyclops Specialty Steel Division of Cyclops and the former Empire-Reeves became the Empire-Reeves Steel Division of Cyclops. Plaintiff consistently has engaged in the manufacture, fabrication, and sale of steel products.

Cyclops, Universal-Cyclops and Empire-Reeves each reported its income on the accrual method of accounting and filed its federal corporate income tax returns on a calendar year basis for all years relevant to this action. A majority of plaintiff's hourly employees were represented in collective bargaining by locals of the United Steelworkers of America. During the calendar years 1962 through 1969, Universal-Cyclops employed the following average number of active hourly employees who were represented by the Union:

| Year | Number |
|------|--------|
| 1962 | 2,469 |
| 1963 | 2,381 |
| 1964 | 2,479 |
| 1965 | 2,639 |
| 1966 | 2,841 |
| 1967 | 2,501 |
| 1968 | 2,299 |
| 1969 | 2,349 |

The Union, an international labor organization functioning principally in the basic steel industry, represents workers in plants accounting for more than 90 percent of total national steel ingot capacity. The Union also functions in related industries, including steel processing and fabricating, aluminum, copper, iron mining and ore shipping, containers, certain other transportation, and miscellaneous enterprises. The Union has over one million individual members (consisting of individuals in the non-supervisory occupations, including some white-collar workers, in the industries in which it claims jurisdiction) who are organized into about 3,000 local unions.

---

14. Refer to Stip. X 25, 26, 32, 33, 35 and 36.

## 1956 *Negotiations*

In 1956, a group of ten or eleven large steel companies bargained jointly with the Union on major issues, with the understanding that the economic settlement agreed upon would be applied uniformly among the group of major companies. A four-man negotiating team, composed of two representatives from the United States Steel Corporation and one each from Bethlehem Steel and Republic Steel represented the companies. Each company bargained individually with the Union on local issues and on problems peculiar to their company.

One of the issues on which the major companies bargained jointly with the Union in 1956 was a proposal by the Union for a supplemental unemployment benefit program. Each of the major companies agreed to establish a supplemental unemployment benefit plan. After agreement on the terms of the SUB plan had been reached in the joint negotiations, the remaining companies in the basic steel industry whose employees were represented by the Union also adopted the SUB plans. Thus, separate, virtually identical SUB plans were placed in operation in practically all companies in the industry.

Before the 1956 labor negotiations and apparently to assist in the formulation of a proposal for supplemental unemployment benefits, the Union, by letters dated February 23, 1956, requested the following employment data from the companies, including plaintiff:

(a) A record of fluctuations in employment for the period from January 1, 1949 to the date of letter (including new hires, lay-offs, and withdrawals from service).

(b) A year-by-year record of the total duration of lay-offs of employees, grouped into certain categories, omitting, in any year, those employees whose lay-offs aggregated less than one week and any period of lay-off of an employee whose continuous service at the start of such period was less than one year.

(c) Man-hours (i) worked and (ii) paid for, and total compensation paid, by months, in the same period.

(d) A record, by year, of employment terminations or transfers resulting from the permanent closing or discontinuance of a plant, department, or substantial part thereof, during the same period.
On May 9 and May 31, 1956, Universal-Cyclops furnished the Union with the available data.

The purpose of the SUB plan was to supplement the benefits available to laid-off covered employees under state system unemployment benefit programs. The objective was to provide laid-off employees (with two or more years' service) with 65 percent of their after-tax take-home pay, taking into account state benefits, for periods up to 52 weeks.

The Union presented two arguments in support of the SUB plan: (1) benefits payable under state unemployment programs were too low for steel workers because the state benefits were generally established by relation to average earnings of the state work force; and (2) the steel industry had traditionally been a cyclical industry with occasional periods of unemployment longer than the period of between 13 and 26 weeks during which most state benefits were paid.

## 1956 *Universal-Cyclops SUB Plan*

Universal-Cyclops, a smaller company in the basic steel industry, did not participate in the joint negotiations in 1956. After the pattern of the "economic package," including the SUB plan, had been established for the industry by the joint negotiations, the Union presented the package to Universal-Cyclops as its proposal for settlement. On August 31, 1956, Universal-Cyclops agreed with the Union to establish effective August 3, 1956 a Supplemental Unemployment Benefit Plan.

Under Articles IV and V of the plan, Universal-Cyclops agreed to contribute funds to provide its employees with cash

benefits during periods of total unemployment resulting from a reduction in work force or the permanent shutdown of a plant, department or subdivision, and during weeks in which, because of lack of work, an employee was scheduled or assigned to work less than 32 hours.

Article III of the plan required plaintiff to establish a trust fund for the payment of benefits. All contributions were to be paid into the trust fund. To implement this provision, Universal-Cyclops entered into a trust agreement dated August 3, 1956 with The Hanover Bank, now Manufacturers Hanover Trust Company, of New York, New York, as trustee for the creation of the trust fund. The Universal-Cyclops SUB Trust was determined by the Internal Revenue Service to be exempt from federal income taxes as an organization under section 501(c) of the Internal Revenue Code of 1954, as amended.

Article VII of the plan fixed the weekly benefits payable to employees on layoff at 65 percent of their after-tax straight-time weekly wage (reduced by the amount of any state unemployment benefits to which they were entitled), subject, however, to prescribed maximums. The maximum weekly benefit was set at $25 (plus $2 for each of not more than four dependents) for weeks in which state unemployment benefits were received, and $47.50 (plus $2 for each of not more than four dependents) for weeks after state benefits were discontinued. In addition, provision was made in Article VIII for the reduction of weekly benefits by a percentage factor when the total finances of the plan dropped below prescribed levels. The duration for which benefits would be continued for an employee on layoff was dependent upon the number of his credit units (earned at prescribed rates during periods when working) as defined in Article VI, but could in no event exceed 52 weeks.

The obligations of Universal-Cyclops under the 1956 SUB plan consisted of a cash liability and a contingent liability and were to be paid or incurred in the following manner:

(a) Under section 1 of Article IV, Universal-Cyclops was required to make cash contributions to the SUB Trust at the rate of 3 cents per hour worked by employees covered by the 1956 SUB plan for the calendar month of August, 1956 and for each calendar month thereafter during the term of the 1956 SUB plan, subject, however, to certain enumerated limitations intended to prevent the total finances of the 1956 SUB plan from exceeding defined maximum levels.

(b) Under section 3 of Article IV, Universal-Cyclops incurred a contingent liability to make additional contributions to said trust at the rate of 2 cents per hour worked by covered employees during the same periods described in (a) above. The accumulation of this contingent liability was subject to limitations designed to prevent the total finances from exceeding defined maximum levels. Universal-Cyclops was required to make cash contributions in satisfaction of its contingent liability only in the event that the trust assets were insufficient to pay the unemployment benefits provided under the said plan. In such an event, the accumulated contingent liability was to be reduced by an amount equal to the cash contributions.

Paragraph 9 of the 1956 SUB agreement stated that the balance of the accumulated contingent liability of Universal-Cyclops would be cancelled at the expiration of said agreement. Article XII of the 1956 SUB plan provided that upon termination, all the remaining assets in the SUB Trust were subject to all the applicable provisions of the plan and were to be used until exhausted to pay unemployment benefits to eligible employees. In no event could any assets of the trust be returned to Universal-Cyclops.

Paragraph 4 of the SUB Trust provided in part as follows:

Notwithstanding anything to the contrary contained herein, at no time shall any part of the corpus or income of the fund (other than such part as is

required to pay taxes and expenses of the Trustee, as provided in Paragraph 9), be used for or diverted to, purposes other than for the exclusive benefit of employees under the plan and their beneficiaries.

In addition, paragraph 13 of said SUB Trust provided in part as follows:

[N]o termination, modification, or amendment shall permit any part of the corpus or income of the fund to be used for, or diverted to, purposes other than for the exclusive benefit of employees under the plan and their beneficiaries. In the event of termination of the Trust, all assets then constituting the fund, less any amounts constituting charges and expenses payable from the fund, shall be used until exhausted to pay weekly benefits to eligible employees under the plan. . . . ."

### 1959–60 *Negotiations*

The 1956 SUB agreement was to expire on June 30, 1959 under paragraph 10 of the plan, but was extended by agreement of Universal-Cyclops and the Union until July 14, 1959.

Under paragraph 9 of the 1956 SUB agreement, the balance of the contingent liability previously incurred by Universal-Cyclops was cancelled on July 14, 1959 upon the termination of said agreement.

As a result of the negotiations conducted during 1959 and 1960, the 1956 Universal-Cyclops SUB agreement was extended without change in terms to December 31, 1962, by a memorandum of agreement dated January 15, 1960. The balance of the contingent liability which had been cancelled on July 14, 1959 was restored under the 1956 Universal-Cyclops SUB plan in accordance with another memorandum of agreement dated April 1, 1960.

### 1960 *Empire-Reeves SUB Plan and* 1960 *Reeves Steel SUB Plan*

On February 24, 1960, under essentially the same conditions and circumstances as those experienced by Universal-Cyclops in 1956, Empire-Reeves entered into a collectively negotiated SUB agreement with the Union under which Empire-Reeves agreed to establish effective September 1, 1961 a SUB plan for the purpose of supplementing state unemployment benefits available to its Union employees at its Mansfield, Ohio, plant.

On February 27, 1960, under essentially the same conditions and circumstances as experienced by Universal-Cyclops in 1956, Reeves Steel entered into a collectively negotiated SUB agreement with the Union under which Reeves Steel agreed to establish effective September 1, 1961 a SUB plan for the purpose of supplementing the state unemployment benefits available to its Union employees at its Dover, Ohio, plant.

Under Articles IV and V of the 1960 Empire-Reeves SUB plan and the 1960 Reeves Steel SUB plan, Empire-Reeves and Reeves Steel agreed to contribute funds required to provide their eligible employees with cash benefits during periods of total unemployment resulting from a reduction in work force or the permanent shutdown of a plant, department or subdivision, and during weeks in which, because of lack of work, an employee was scheduled or assigned to work less than 32 hours.

Under Article III of the 1960 Empire-Reeves SUB plan, Empire-Reeves was required to establish a trust fund for the payment of benefits. All contributions were to be paid into the trust fund. To implement these provisions, Empire-Reeves entered into a trust agreement dated August 29, 1961 with First National Bank of Mansfield, Mansfield, Ohio, as trustee.

Reeves Steel, pursuant to Article III of the 1960 Reeves Steel SUB plan, was also required to establish a similar trust fund and accordingly entered into a trust agreement dated August 29, 1961 with the Reeves Banking & Trust Company, Dover, Ohio, as trustee.

The Empire-Reeves SUB trust and the Reeves Steel SUB trust were determined by the Internal Revenue Service to be exempt organizations and therefore ex-

empt from federal income taxes under section 501(c) of the Internal Revenue Code of 1954, as amended.

Article VII of the 1960 Empire-Reeves SUB plan and 1960 Reeves Steel SUB plan fixed, in the same manner as the 1956 Universal-Cyclops SUB plan, the weekly benefits payable to employees on layoff at 65 percent of their after-tax straight-time weekly wage (reduced by the amount of any state unemployment benefits to which they were entitled), subject, however, to prescribed maximums. The maximum weekly benefit was set at $25 (plus $2 for each of not more than four dependents) for weeks in which state unemployment benefits were received, and $47.50 (plus $2 for each of not more than four dependents) for weeks after state benefits were discontinued. The weekly benefits were reduced by a percentage factor where the total finances of said plan dropped below prescribed levels. The duration for which benefits would be continued for an employee on layoff was dependent upon the number of his credit units (earned at prescribed rates during periods when working) as defined in Article VI, but could in no event exceed 52 weeks.

The obligations of Empire-Reeves and Reeves Steel under Article IV of their SUB plans consisted of a cash liability and a contingent liability identical to that of Universal-Cyclops under its 1956 SUB plan and were to be paid or incurred in the following manner:

(a) Under section 1 of Article IV, Empire-Reeves and Reeves Steel each were required to make cash contributions to their SUB trusts at the rate of 3 cents per hour worked by employees covered by their SUB plans for the calendar month of September 1961, and for each month thereafter during the term of said SUB plans; subject, however, to certain enumerated limitations intended to prevent the total finances of said SUB plans from exceeding defined maximum levels.

(b) Under section 3 of Article IV, Empire-Reeves and Reeves Steel each incurred a contingent liability to make additional contributions to their respective SUB trusts at the rate of 2 cents per hour worked by covered employees during the terms set forth in (a) above. The accumulation of this contingent liability was subject to limitations designed to prevent the total finances of the SUB plans from exceeding defined maximum levels. Empire-Reeves and Reeves Steel were required to make cash contributions in satisfaction of their contingent liabilities only in the event that the trust assets of their respective SUB trusts were insufficient to pay the unemployment benefits provided under the SUB plans. In such an event, the accumulated contingent liabilities of Empire-Reeves and Reeves Steel were to be reduced by amounts equal to their respective cash contributions.

Paragraph 9 of the 1960 Empire-Reeves SUB agreement and the 1960 Reeves Steel SUB agreement provided that the balances of the accumulated contingent liabilities of Empire-Reeves and Reeves Steel would be cancelled at the expiration of said agreements. Article XII of the 1960 Empire-Reeves SUB plan and Reeves Steel SUB plan provided that upon termination, the remaining assets in the Empire-Reeves SUB trust and Reeves Steel SUB trust were subject to applicable provisions of the SUB plans and were to be used until exhausted to pay unemployment benefits to eligible employees. In no event could any assets of the trusts be returned to Empire-Reeves or Reeves Steel.

Article IV of the Empire-Reeves SUB trust provided in part as follows:

Notwithstanding anything to the contrary contained herein, at no time shall any part of the corpus or income of the Fund (other than such part as is required to pay taxes and expenses of the Trustee, as provided in Article III) be used for or diverted to, purposes other than for the exclusive benefit of employees under the Plan and their beneficiaries.

Article XIV of the SUB trust provided in part as follows:

[N]o termination, modification or amendment shall permit any part of the corpus or income of the Fund to be used for, or diverted to, purposes other than for the exclusive benefit of Employees under the Plan and their beneficiaries. In the event of termination of the Trust all assets then constituting the Fund, less any amounts constituting charges and expenses payable from the Fund, shall be used until exhausted to pay weekly benefits to eligible employees under the Plan and their beneficiaries.

Article IV of the Reeves Steel SUB trust provided in part as follows:

Notwithstanding anything to the contrary contained herein, at no time shall any part of the corpus or income of the Fund (other than such part as is required to pay taxes and expenses of the Trustee, as provided in Article III) be used for or diverted to, purposes other than for the exclusive benefit of employees under the plan and their beneficiaries.

Article XIV of the SUB trust provided in part as follows:

[N]o termination, modification or amendment shall permit any part of the corpus or income of the Fund to be used for, or diverted to, purposes other than for the exclusive benefit of Employees under the Plan and their beneficiaries. In the event of termination of the Trust all assets then constituting the Fund, less any amounts constituting charges and expenses payable from the Fund, shall be used until exhausted to pay weekly benefits to eligible employees under the Plan and their beneficiaries.

*Plaintiff's Contributions Under 1956 and 1960 SUB Plans*

For the period August 1, 1956 through June 30, 1962, Universal-Cyclops made the following cash contributions to the Universal-Cyclops SUB trust (rounded to nearest thousands of dollars) as required in Article IV of the 1956 Universal-Cyclops SUB plan:

| Calendar Year | Total Elapsed Amount Paid |
| --- | --- |
| 1956 | $ 0 |
| 1957 | 219,000 |
| 1958 | 171,000 |
| 1959 | 146,000 |
| 1960 | 109,000 |
| 1961 | 194,000 |
| 1962 (to June 30) | 58,000 |

Universal-Cyclops, in each of its federal corporate income tax returns for the calendar years 1956 through 1961, claimed and was allowed deductions for the amounts of its cash contributions (including amounts accrued as a cash liability) to the Universal-Cyclops SUB trust made pursuant to the 1956 Universal-Cyclops SUB plan. Universal-Cyclops did not claim deductions in its tax returns for these calendar years with respect to the unpaid contingent liability under the 1956 Universal-Cyclops SUB plan.

For the period September 1, 1961 through January 31, 1963, Empire-Reeves made the following cash contributions to the Empire-Reeves SUB trust (rounded to nearest thousands of dollars) as required by Article IV of the 1960 Empire-Reeves SUB plan:

| Calendar Year | Amount Paid |
| --- | --- |
| 1961 | $18,000 |
| 1962 | 67,000 |
| 1963 (to January 31) | 4,000 |

For the period September 1, 1961 through January 31, 1963, Reeves Steel made the following cash contributions to the Reeves Steel SUB trust (rounded to nearest thousands of dollars) as required by Article IV of the 1960 Reeves Steel SUB plan:

| Calendar Year | Amount Paid |
| --- | --- |
| 1961 | $ 6,000 |
| 1962 | 24,000 |
| 1963 (to January 31) | 1,000 |

Empire-Reeves, in its income tax return for 1961, claimed and was allowed a deduction for the cash contributions (in-

cluding amounts accrued as a cash liability) to the Empire-Reeves SUB trust and Reeves Steel SUB trust under the 1960 Empire-Reeves and Reeves Steel SUB plans. Empire-Reeves did not claim a deduction in its 1961 tax return with respect to the unpaid contingent liability under either the 1960 Empire-Reeves SUB plan or the 1960 Reeves Steel SUB plan.

### 1962 Negotiations

In 1962, representatives of the steel industry and the Union began negotiations for a new labor agreement. These negotiations were conducted essentially in the same manner as in 1956. Eleven major producers of steel represented by a four-man team bargained jointly with the Union on economic issues. The negotiating team represented the companies in the group and, at the conclusion of the negotiations, a single memorandum and agreement was executed by the eleven companies and the Union. Universal-Cyclops and Empire-Reeves did not participate in the joint negotiations but were members of a group of smaller companies which had a representative at meetings in which the four-man negotiating team reported the progress of negotiations.

During the 1962 negotiations, the Union contended that the 5 cent per hour contribution rate had proven inadequate to supply the funds required to pay the full benefits contemplated in the 1956 negotiations, and that the provision for cancellation of contingent liability deprived the SUB plans of resources needed to pay benefits during periods of unemployment. The Union contended that the heavy unemployment and layoffs experienced in the steel industry in the years 1956–1961 had brought about a substantial drain on SUB plan resources, and as a consequence there had been frequent reductions in benefits paid under the SUB plans. The Union demanded an increase in the 5 cent per hour maximum contribution rate and abolition of the provision for cancellation of con-

tingent liability when "maximum financing" was reached.

The Union was dissatisfied with the provisions permitting cancellation of contingent liability for a second reason: During bargaining sessions with the Union, industry representatives attempted to secure what is referred to as credit for items in collective bargaining in terms of the total package cost. The industry representatives argued that all the contingent liability under the 1956 SUB plans had been cancelled and therefore it was no longer an obligation of the various steel companies. Therefore, the steel industry representatives argued that if the 1956 SUB plan was readopted in 1962, then they could take additional credit for the new obligation on the basis that the prior contingent liability had only been effective through the term of the preceding contract. The Union desired to eliminate any basis for such bargaining claims in the future.

The Union therefore insisted that the cancellability feature of the contingent liability be eliminated from the 1962 SUB plan and that the contributions of the companies to the SUB plan trust should be entirely in cash. The Union claimed that by permitting part of the contribution to be in the form of a noncash deferred obligation the Union was forced to take the risk of the continued financial health of the steel companies, particularly because over a period of time virtually all of the plan resources will be in the form of unfunded liability.

The position of the companies was that the Union's first two criticisms of the 1956 SUB plans' contingent liability provisions could be eliminated by providing that the deferred obligation under the 1962 SUB plans be non-cancellable in any event. However, the companies believed that in view of the financial position of the steel companies, the demand for all-cash payments was invalid. The Union agreed to drop its demand for an all-cash arrangement on the condition that no obligation under the 1962 SUB plans not immediately payable in cash was to be subject to cancellation for any

reason. This condition was agreed to by industry and was incorporated in the 1962 SUB plans.

The industry and Union also agreed that all the contingent liability which had accumulated under the 1956 SUB plans would be carried forward under the 1962 SUB plans and would thereafter be non-cancellable.

The companies and the Union agreed that the financial resources of the new SUB plans (as expressed in terms of the hourly rate of contribution) should be set at a level which, based upon the unemployment experience of the United States Steel Corporation during a period extending from September 1956 through November 1961, would permit as nearly as possible payment of the intended benefits. Because of United States Steel's position as the largest producer in the basic steel industry (accounting for approximately 25 percent of total industry production), its unemployment experience was considered by both the companies and the Union as an appropriate model for formulating the new financing arrangements which would apply industry-wide.

A group of experts on economics and statistics selected by the steel companies and the Union, using the United States Steel model unemployment data, estimated that the cost per hour of providing benefits under the original 1956 benefit formula was 6.7 cents and the added cost per hour of all of the new benefits agreed upon in 1962 would be 3.3 cents. The reduction in hourly cost which would accompany certain benefit reductions on the basis of the United States Steel model unemployment experience was calculated to be 0.5 cents. In calculating the level of contribution which would be required to provide the SUB plan benefits and the amount of benefits which would be paid using the United States Steel model unemployment data, the experts took into account the balance of the contingent liability under the 1956 SUB plans which was to be carried forward to the 1962 SUB plans in the form

of "Contingent Liability." In the light of this analysis, the negotiators concluded that a contribution rate of 9.5 cents per hour would be required to provide the agreed-upon SUB plan benefits.

After a series of proposals and counter-proposals, the Union and industry agreed to a number of revisions in the contribution, benefit and financing provisions of the SUB plan which were designed, in large measure, to correct the defects of which the Union negotiators complained regarding the cancellable feature of the earlier contingent liability account. After agreement on the terms of the revised SUB plans had been reached in the 1962 joint negotiations involving the major producers of steel, the remaining companies in the basic steel industry whose employees were represented by the Union also consummated revised SUB plan agreements on substantially identical terms. Thus, the revised SUB plan agreements were adopted on an industry-wide basis.

The basic purposes of the 1956 SUB plan remained fundamentally the same in the 1962 SUB plan.

On or about April 2, 1962, the Union prepared a written explanation for its members of the negotiated changes in the 1962 SUB plan. On page 2 of said explanation under the caption of "Increased Company Contributions," the Union made the following statement:

A very important improvement in the contingent liability arrangement now insures that every cent ever contributed as cash or contingent liability to the SUB Plan will always be available for employee benefits. The present contingent liability and any future contingent liability will not be subject to cancellation for any reason whatsoever. The present provisions which permit cancellation of contingent liability when total finances are in excess of maximum financing or when the SUB Agreement terminates, are eliminated.

The foregoing statement accurately reflects the intent of the steel industry and Union negotiators in the 1962 steel industry labor negotiations.

Concurrently in 1962, the companies and the Union developed a new plan to provide for extra vacation and savings benefits to be financed at the rate of 3 cents per hour worked, an amount known at the time to be insufficient to provide the benefits of the plan. It was agreed that an additional amount up to 4½ cents per hour worked by employees covered by the savings and vacation plan would be available for transfer from the 1962 SUB plans to the finances of the new savings and vacation plans. The benefit structure of the savings and vacation plan was such that if substantial amounts became available for transfer to it from the SUB plans, only such amounts as could be currently used for benefits under the savings and vacation plans would be transferred. The excess of the amount available for transfer over the amount required to provide current benefits under the savings and vacation plans was retained as a liability under the SUB plans.

### Adoption of Revised SUB Plans and 1962 S & V Plans

On October 3, 1962, Universal-Cyclops entered into its separate collective bargaining agreement with the Union whereby (i) in section XIII the 1956 Universal-Cyclops SUB plan was to be amended and restated in the form of a booklet entitled "Supplemental Unemployment Benefit Plan, As Revised July 1, 1962," and (ii) in Section XII the Universal-Cyclops Savings and Vacation Plan was adopted effective as of July 1, 1962 in substantially the same form as developed by the steel companies—Union labor negotiators.

On September 1, 1962, Empire-Reeves entered into its separate collective bargaining agreement with the Union whereby (i) in section 19 the 1960 Empire-Reeves SUB plan was to be amended effective as of February 1, 1963, and restated in the form of a booklet entitled "Supplemental Unemployment Benefit Plan, As Revised September 1, 1962," and (ii) in section 20 the Empire-Reeves

Savings and Vacation Plan was adopted effective as of September 1, 1962 in substantially the same form as the Universal-Cyclops Savings and Vacation Plan.

On September 1, 1962, Reeves Steel entered into its separate collective bargaining agreement with the Union whereby (i) in section 27 the 1960 Reeves Steel SUB plan was to be amended effective as of February 1, 1963, and restated in the form of a booklet entitled "Supplemental Unemployment Benefit Plan, As Revised September 1, 1962," and (ii) in section 28 the Reeves Steel Savings and Vacation Plan was adopted effective as of September 1, 1962 in substantially the same form as the Universal-Cyclops Savings and Vacation Plan.

Under the terms of the 1962 Universal-Cyclops SUB plan, 1962 Empire-Reeves SUB plan, and 1962 Reeves Steel SUB Plan, all contributions when made were required to be paid to the trusts established under their respective earlier SUB plans, and all benefits to eligible employees payable under the revised SUB plans were to be paid from those trusts.

Under paragraph 1.0 of each of the revised SUB plans, the weekly benefit payable to employees on layoff was increased (from 65 percent of after-tax straight-time weekly wage under the 1956 SUB plan) to 24 times the employee's average straight-time hourly earnings, plus $1.50 for each of not more than four dependents, subject, however, to prescribed maximums. The maximum weekly benefit during weeks of state system entitlement was increased in paragraph 1.4 (from $25 plus $2 for each dependent up to four in the 1956 SUB plans) to $37.50 plus $1.50 per dependent up to four. The maximum weekly benefit after termination of state benefits was increased (from $47.50 plus $2 for each dependent up to four in the 1956 SUB plans) to $60 plus $1.50 per dependent up to four. Finally, the provision in the 1956 SUB plan for reducing weekly benefits by a percentage factor when the total finances dropped below 75 percent was liberalized in paragraph 1.5 inasmuch as the reduction would first apply

only after the total finances fell below 35 percent.

Universal-Cyclops, Empire-Reeves, and Reeves Steel each incurred the following liabilities under the provisions of section 8 of the 1962 Universal-Cyclops SUB plan and section 6 of the 1962 Empire-Reeves and Reeves Steel SUB plans:

(a) For the month of July 1962 and for each month thereafter during the term of the 1962 Universal-Cyclops SUB plan, Universal-Cyclops was obligated for a current contribution and a delayed contribution. The term "delayed contribution" is equivalent to the term "contingent liability" referred to in the revised SUB plans.

(b) For the month of February 1963 and for each month thereafter during the term of the 1962 Empire-Reeves and Reeves Steel SUB plans, Empire-Reeves and Reeves Steel each incurred a like monthly obligation consisting of the current and delayed contribution.

(c) The monthly obligation was the lesser of (i) 9.5 cents per hour worked during each calendar month by all covered employees, or (ii) an amount which when added to the total finances of the particular revised SUB plan as of the end of the preceding calendar month would bring the total finances to defined maximum levels. The current contribution element of the monthly obligation was the amount by which (a) the product of 10.5 cents multiplied by the number of hours worked by all covered employees for the first 12 of the 14 months preceding the contribution month exceeded (b) the total finances of the particular revised SUB plan at the end of the preceding month, but not to exceed 4.5 cents per hour worked by all covered employees during the month. The delayed contribution element of the monthly obligation, being the balance of the monthly obligation, was to be paid at the earliest of (1) such times as required to pay unemployment benefits under the particular revised SUB plan, (2) such times as all the operations of Universal-

Cyclops, Empire-Reeves, or Reeves Steel in which covered employees were working were permanently shut down, or (3) the termination of the particular revised SUB plan. The actual payment of any part of the delayed contributions would cancel an equal amount of accumulated delayed contribution.

Under the terms of the 1962 Universal-Cyclops savings and vacation plan, the 1962 Empire-Reeves savings and vacation plan, and the 1962 Reeves Steel savings and vacation plan, each company was required to establish a financial availability account which was to be funded through cash payments at the rate of 3 cents per hour worked from and after the effective dates of the 1962 S & V plans.

In addition to the liability for the cash payment of 3 cents per hour worked under the 1962 S & V plans and the current contribution and delayed contribution elements of the monthly obligation under the revised SUB plans, Universal-Cyclops, Empire-Reeves and Reeves Steel each incurred a liability under the terms of agreements between the companies and the Union set forth in an appendix to the revised SUB plans, and also under the terms of the 1962 S & V plans, for an additional delayed contribution to their respective SUB trusts equal to the excess of (i) the difference, not to exceed 4.5 cents per hour worked, between the maximum monthly obligation (9.5 cents per hour) under the revised SUB plan and the amount required to raise the total finances of the revised SUB plan to maximum financing, over (ii) the amount of such difference being concurrently transferred to the financial availability account under the 1962 S & V plan for the purpose of providing vacation benefits to eligible employees. This additional delayed contribution was commonly referred to as "additional contingent liability."

Paragraph 8.7(b) of the 1962 Universal-Cyclops SUB plan provided that the balance as of June 30, 1962 of contingent liability under the 1956 Universal-Cyclops SUB plan, as amended on April 1,

1960, would be carried forward under the 1962 SUB plan. The amount of the carry-forward of such contingent liability was $402,901.27, and was thereafter payable to the Universal-Cyclops SUB trust in the same manner as the delayed contribution element of the monthly obligation. The prior provisions of the 1956 Universal-Cyclops SUB plan relating to cancellation and extinguishment of the contingent liability were deleted in their entirety from the 1962 Universal-Cyclops SUB plan.

Paragraph 6.7(b) of the 1962 Empire-Reeves and Reeves Steel SUB plans also provided that the balances as of January 31, 1963, of the contingent liability under their respective 1960 SUB plans would be carried forward under the 1962 SUB plans. The amount of the carry-forward under the 1960 Empire-Reeves SUB plan was $63,753.60, and the amount under the 1960 Reeves Steel SUB plan was $22,320.80. Both amounts were thereafter payable to the Empire-Reeves and Reeves Steel SUB trusts in the same manner as the delayed contribution element of the monthly obligation. The prior provisions of the 1960 Empire-Reeves and Reeves Steel SUB plans relating to cancellation and extinguishment of the contingent liability were deleted in their entirety from the 1962 Empire-Reeves and Reeves Steel SUB plans.

Paragraph 9.10 of the 1962 Universal-Cyclops SUB plan and paragraph 7.9 of the 1962 Empire-Reeves and Reeves Steel SUB plans each provided that:

Upon termination of the Plan, the assets then remaining in the Fund and the Contingent Liability shall be subject to all the applicable provisions of the Plan then in effect and shall be used until exhausted to pay Benefits to employees in the order of their entitlement. The provisions with respect to the reduction of Weekly and Short Week Benefits which are set forth in Paragraph 1.5 shall not thereafter be effective. If at any time there are assets in the Fund or there is a balance of Contingent Liability and all the operations of the Company in which there are employees covered by the Plan shall be permanently shut down, arrangements for disposition of assets and Contingent Liability in a manner designed to promote the purposes of the Plan shall be made. Such arrangements shall be by agreement with the collective bargaining representatives of employees covered by the Plan.

The unused contingent liability under the 1956 SUB plans which was carried forward under the 1962 SUB plans was not treated differently than the delayed contribution element of the monthly obligation and was considered as part of the total finances of the 1962 SUB plans available to pay benefits.

The unused contingent liability under the 1956 SUB plans which was carried forward under the 1962 SUB plans became noncancellable in the same fashion as the delayed contribution element of the monthly obligation.

The provisions of the 1962 SUB plans which provide for the non-cancellability of the delayed contribution element of the monthly obligation also applies to the additional delayed contributions.

The additional delayed contributions under the 1962 SUB plans could only be cancelled through the payment of benefits to employees.

The additional delayed contributions under the 1962 SUB plans were available for the payment of unemployment benefits and were so used by certain steel companies.

The additional delayed contributions under the 1962 SUB plans had the same qualities and characteristics as the delayed contributions except for the following two distinctions:

(a) Unlike the delayed contribution, the additional delayed contribution was not considered as part of the total finances of the 1962 SUB plan for purposes of determining the amount of the monthly obligation, or, in other words, in fixing the amount of the company's contributions. However, like the delayed

contribution, the additional delayed contribution was considered a part of the total finances for purposes of determining the amount of the unemployment benefits payable to employees; and

(b) The additional delayed contribution, unlike delayed contributions, may be used not only for unemployment benefits, but also for vacation benefits in accordance with the terms of the 1962 S & V plans.

The words "contingent liability" as used in section 9.10 of the 1962 Universal-Cyclops SUB plan were intended to include both delayed contributions and additional delayed contributions.

The provision in section 9.10 of the 1962 Universal-Cyclops SUB plan (and the identical provisions in the 1962 Empire-Reeves and Reeves Steel SUB plans) relating to making arrangements for the distribution of the trust funds, including delayed contributions and additional delayed contributions, in the event of the permanent shutdown of company operations, related to how the trust funds would be distributed to employees and not to whether such funds would be distributed.

The term "contingent liability" was used to describe the delayed contributions in the 1962 SUB plans, even though the concept was changed from a contingent liability under the 1956 SUB plans to a fixed and absolute liability under the 1962 SUB plans.

The industry and labor negotiators in 1962 intended that the delayed contributions and additional delayed contributions under the 1962 SUB plans were fixed and irrevocable obligations of the companies.

### Plaintiff's Contributions Under Revised SUB Plans

Universal-Cyclops timely filed a United States corporation income tax return for the calendar year 1962 with the District Director of Internal Revenue at Pittsburgh, Pennsylvania, reflecting a total tax liability for the year in the amount of $317,026, all of which amount has been paid.

Universal-Cyclops, in its 1962 tax return, claimed a deduction in the amount of $659,847 as an ordinary and necessary business expense under section 162 of the Internal Revenue Code of 1954, as amended, representing the sum of the monthly obligations accrued by Universal-Cyclops under the 1956 and 1962 Universal-Cyclops SUB plans during the calendar year 1962. Of this amount, $402,901 represented the contingent liability from the 1956 Universal-Cyclops SUB plan carried forward as of June 30, 1962, and $175,016 represented the delayed contributions element of the monthly obligation under the 1962 Universal-Cyclops SUB plan incurred between July 1, 1962 and December 31, 1962. The balance of $81,930 represented the current contributions for the year 1962 under the 1956 Universal-Cyclops SUB plan and the 1962 Universal-Cyclops SUB plan.

A deficiency in corporate income tax, together with interest, for the year 1962 was assessed against and paid by Universal-Cyclops based upon the partial disallowance of the claimed deduction of the monthly obligations accrued under the 1962 Universal-Cyclops SUB plan during the year 1962 in the amount of $552,917, being the difference between the total amount accrued as monthly obligations and the amount paid to the Universal-Cyclops SUB trust for that year.

A timely claim for refund for the year 1962 was filed on September 9, 1966 with the District Director of Internal Revenue at Pittsburgh, Pennsylvania, wherein Cyclops demanded, *inter alia*, a refund of income tax in the amount of $434,338, $215,638 of which is attributable to the disallowance of $552,917 mentioned above, plus interest from the date of payment according to law.

On February 13, 1969, Cyclops executed and delivered to the Assistant Regional Commissioner (Appellate) at Pittsburgh, Pennsylvania, a waiver of statutory notification of claim disallowance which was to become effective on the

date the Joint Committee on Internal Revenue Taxation completed its action on an over-assessment determined for the calendar year 1962 with respect to other issues. Also on February 13, 1969, Cyclops executed an agreement to extend period of limitations under section 6532(a)(2) of the Internal Revenue Code to a date when the decision in the Tax Court case of *Lukens Steel Company v. Commissioner*, 52 T.C. 764, became final, plus 6 months thereafter, and in no event less than the statutory two-year period, such agreement also to become effective on the date the Joint Committee on Internal Revenue Taxation completed its action on an over-assessment determined for the year 1962 with respect to other issues. The said agreement was executed on behalf of the Assistant Regional Commissioner (Appellate) on May 29, 1969. The Joint Committee on Internal Revenue Taxation completed its action on the over-assessment determined for the year 1962 with respect to other issues on July 10, 1969.

On January 7, 1972, before the expiration of 6 months after the decision in *Lukens Steel Company v. Commissioner*, *supra*, became final, Cyclops executed an agreement to extend period of limitations to September 30, 1972, which agreement was executed by the Chief, Appellate Branch Office, Pittsburgh, Pennsylvania, on behalf of the Assistant Regional Commissioner on January 10, 1972. Cyclops and the Chief, Appellate Branch Office, Pittsburgh, on behalf of the Assistant Regional Commissioner on September 28, 1972 executed an agreement to extend period of limitations further extending to December 31, 1972 the period within which suit for refund could be instituted.

Empire-Reeves timely filed an income tax return for the calendar year 1962 with the District Director of Internal Revenue at Cleveland, Ohio, reflecting a total tax liability for the year in the amount of $4,376,608, all of which amount has been paid.

Empire-Reeves, in the 1962 return, claimed a deduction in the amount of $170,825 as an ordinary and necessary business expense under section 162 of the Internal Revenue Code of 1954, as amended, representing the total sum of the monthly obligations accrued by Empire-Reeves and Reeves Steel under the 1960 and 1962 Empire-Reeves and Reeves Steel SUB plans during 1962. Of this sum, $59,877 represented the contingent liability from the 1960 Empire-Reeves SUB plan carried forward as of December 31, 1962, and $21,079 represented the contingent liability carried forward from the 1960 Reeves Steel SUB plan as of December 31, 1962, for a total amount of $80,956. The remaining balance of $89,869 of the total amount claimed represented the current contributions under the 1960 Empire-Reeves SUB plan and the 1960 Reeves Steel SUB plan for the year 1962.

Notwithstanding the deduction of $80,956 claimed by Empire-Reeves in the calendar year 1962 for the contingent liability carried forward from the 1960 Empire-Reeves and Reeves Steel SUB plans, said contingent liability did not become part of the delayed contribution element of the monthly obligation under the 1962 Empire-Reeves and Reeves Steel SUB plans until February 1, 1963. To the extent that said contingent liability carried forward was not claimed as a proper deduction because it had not accrued in the year 1962, the $80,956 contingent liability carried forward would have been accrued and claimed as a deduction by Empire-Reeves in its 1963 income tax return.

A deficiency in corporate income tax, together with interest, for the year 1962 was assessed against and paid by Empire-Reeves based upon the partial disallowance of the claimed deduction of the monthly obligations accrued under the 1960 and 1962 Empire-Reeves and Reeves Steel SUB plans during the year 1962 in the amount of $80,956, being the difference between the total amount accrued as monthly obligations under said plans and the amounts paid to the Em-

pire-Reeves and Reeves Steel SUB trusts for that year.

A timely claim for refund for the calendar year 1962 was filed on December 22, 1969 with the District Director of Internal Revenue at Pittsburgh, Pennsylvania, wherein Cyclops demanded a refund of income tax in the amount of $42,097 for said calendar year, together with interest paid, plus interest from the date of payments according to law.

Prior to the commencement of the within action, more than 6 months had elapsed after the filing of said claim for refund without Cyclops having received the notice described in section 6532(a)(1) of the Internal Revenue Code of 1954, as amended.

On January 30, 1963, Universal-Cyclops and the Union agreed to amend the 1962 Universal-Cyclops S & V plan.

On October 13, 1963, Universal-Cyclops and the Union entered into a collective bargaining agreement, containing, *inter alia,* amendments to the 1962 Universal-Cyclops SUB plan and the 1962 Universal-Cyclops S & V plan, as previously amended.

Universal-Cyclops timely filed a United States corporation income tax return for the calendar year 1963 with the District Director of Internal Revenue at Pittsburgh, reflecting a total tax liability for the year in the amount of $1,428,558, all of which amount has been paid.

Universal-Cyclops, in its 1963 income tax return, claimed a deduction in the amount of $204,737 as an ordinary and necessary business expense under section 162 of the Internal Revenue Code of 1954, as amended, representing the monthly obligations accrued by Universal-Cyclops under the 1962 Universal-Cyclops SUB plan during the calendar year 1963.

A deficiency in corporate income tax, together with interest, for the year 1963 was assessed against and paid by Universal-Cyclops based upon the partial disallowance of the claim deduction of the monthly obligations accrued under the 1962 Universal-Cyclops SUB plan during the year 1963 in the amount of $9,737, being the difference between the total amount accrued as monthly obligations and the amount paid to the Universal-Cyclops SUB trust for that year.

A timely claim for refund for 1963 was filed on December 22, 1969 with the District Director of Internal Revenue at Pittsburgh for a refund of tax in the amount of $136,018 for the year, together with interest paid, plus interest from the date of payments according to law.

Prior to the commencement of this action, more than 6 months had elapsed after the filing of the claim for refund without Cyclops having received the notice described in section 6532(a)(1) of the Internal Revenue Code of 1954, as amended.

Empire-Reeves timely filed a United States corporation income tax return for the calendar year 1963 with the District Director of Internal Revenue at Cleveland, Ohio, reflecting a total tax liability for the year in the amount of $4,412,202, all of which amount has been paid.

Empire-Reeves, in its 1963 return, claimed a deduction in the amount of $12,796 as an ordinary and necessary business expense under section 162 of the Internal Revenue Code of 1954, as amended, representing the monthly obligations accrued by Empire-Reeves and Reeves Steel under the 1960 and 1962 Empire-Reeves and Reeves Steel SUB plans during the year 1963.

A deficiency in corporate income tax, together with interest, for the year 1963 was assessed against and paid by Empire-Reeves based upon the partial disallowance of the claimed deduction of the monthly obligations accrued under the 1962 Empire-Reeves and Reeves Steel SUB plans during the calendar year 1963 in the amount of $5,118, being the difference between the total amount accrued as monthly obligations under the plans and the amounts paid to the Empire-Reeves and Reeves Steel SUB trusts for that year.

A timely claim for refund for the year 1963 was filed on December 22, 1969

with the District Director of Internal Revenue at Pittsburgh for a refund of tax in the amount of $2,662 for the year, together with interest paid, plus interest from the date of payments according to law.

Prior to the commencement of this action, more than 6 months had elapsed after the filing of the claim for refund without Cyclops having received the notice described in section 6532(a)(1) of the Internal Revenue Code of 1954, as amended.

### Adoption of 1964 Universal-Cyclops S & V Plan

In 1963, a completely revised savings and vacation plan was negotiated by the industry and the Union to provide extended vacations to approximately one-half of the employees. The benefits under the revised savings and vacation plan were financed by cash payments of at least 12.5 cents per hour worked to the Financial Availability Account under the revised plan and by possible transfers from the 1962 SUB plans. In addition, the revised savings and vacation plan provided for a transfer of any part of the 12.5 cents hourly accrual to the FAA which was not used for vacation benefits, which transferred amounts became additional delayed contributions under the 1962 SUB plans.

In the October 13, 1963 collective bargaining agreement between Universal-Cyclops and the Union, Universal-Cyclops agreed to amend and restate its 1962 S & V plan in the form of a booklet entitled "Savings and Vacation Plan (Revised) Effective January 1, 1964."

Under section 15.0 of the 1964 Universal-Cyclops S & V plan, Universal-Cyclops incurred a liability to pay 12.5 cents per hour worked to the FAA. In addition, Universal-Cyclops incurred an obligation under section 15.1 of the plan and paragraph E of section XIII of the collective bargaining agreement dated October 3, 1962, as amended by the collective bargaining agreement dated October 13, 1963, for additional delayed contributions to the FAA and referred to

in section 15.1 as "additional hourly accruals (Spillover)." Under section 15.2b of the S & V plan, the maximum hourly accrual to the FAA was 15.625 cents per hour worked, 3.125 cents of which was in the form of spillover from the 1962 Universal-Cyclops SUB plan. Under section 15.7 of the S & V plan, the amount by which the 12.5 cents per hour worked exceeded the interim hourly accrual to the FAA became additional delayed contributions under the 1962 Universal-Cyclops SUB plan and was referred to as "splashback." However, section 15.9 of the S & V plan provided for a maximum cumulative monthly accrual of additional delay contributions, including splashback, in the amount of 3.5 cents per hour worked, less any spillovers to the said S & V plan. The difference between the maximum available "spillover" of 4.5 cents per hour worked set forth in section 15.1 of the S & V plan and the maximum monthly accrual of 3.5 cents as set forth in section 15.9a of the S & V plan was commonly referred to as "evaporation." Finally, section 15.10(b) of the S & V plan provided that to the extent required the "evaporation" could be used to provide vacation benefits.

On September 29, 1963, Reeves Steel and the Union entered into a collective bargaining agreement containing, *inter alia*, amendments to the 1962 Reeves Steel SUB plan and the 1962 Reeves Steel S & V plan. In article III of said agreement, Reeves Steel accepted the financial liability required by its 1962 SUB plan to the extent of paying all unemployment benefits provided thereunder when due.

### Plaintiff's Contributions During 1964–1966 Under Revised SUB Plans

Universal-Cyclops timely filed a consolidated United States corporation income tax return for the year 1964 with the District Director of Internal Revenue at Pittsburgh, reflecting a total tax liability for the year in the amount of $5,742,887, which amount has been paid.

Universal-Cyclops, in its 1964 consolidated income tax return, claimed a deduction in the amount of $204,478 as an

ordinary and necessary business expense under section 162 of the Internal Revenue Code of 1954, as amended, representing the total monthly obligations, including additional delayed contributions, accrued by Universal-Cyclops and Empire-Reeves under their revised SUB plans during 1964.

A deficiency in consolidated income tax, together with interest, for the year 1964 was assessed against and paid by Universal-Cyclops based upon the partial disallowance of the claimed deduction of the monthly obligations, including additional delayed contributions, accrued under the 1962 Universal-Cyclops and Empire-Reeves SUB plans during the year 1964 in the aggregate amount of $86,440, being the difference between the total amount accrued as monthly obligations, including additional delayed contributions, under the 1962 Universal-Cyclops and Empire-Reeves SUB plans and the amount paid to the Universal-Cyclops and Empire-Reeves SUB trusts for that year.

A timely claim for refund for the year 1964 was filed on December 22, 1969 with the District Director of Internal Revenue at Pittsburgh for a refund of income tax in the amount of $43,220 for the year, together with interest paid, plus interest from the date of payment according to law.

Prior to the commencement of this action, more than 6 months had elapsed after the filing of the claim for refund without Cyclops having received the notice described in section 6532(a)(1) of the Internal Revenue Code of 1954, as amended.

On November 11, 1965, the Union and Cyclops, on behalf of its Universal-Cyclops Specialty Steel Division, entered into a collective bargaining agreement, whereby in section XII thereof the 1964 Universal-Cyclops S & V plan was amended without material change. In section XIII of that agreement, the 1962 Universal-Cyclops SUB plan was amended without material change. Under section XV(B), both Universal-Cyclops 1962

SUB plan and 1964 S & V plan were extended to at least December 31, 1968.

On November 1, 1965, Empire-Reeves and the Union entered into a collective bargaining agreement, whereby in article II thereof the 1962 Empire-Reeves S & V plan was amended and restated effective through December 31, 1968 in substantially the same form. In article 12 of that same agreement, Empire-Reeves adopted an extended vacation benefit plan to be effective through December 31, 1968. In article 21 of that agreement, the 1962 Empire-Reeves SUB plan was extended until December 31, 1968.

On November 1, 1965, Reeves Steel and the Union entered into a collective bargaining agreement, whereby in section 27 the 1962 Reeves Steel S & V plan was amended and restated to be effective through December 31, 1968. In section 28 of that same agreement, Reeves Steel adopted an extended vacation benefit plan which was to remain in effect until December 31, 1968. In section 26 of the agreement, the 1962 Reeves Steel SUB plan, as previously amended, was extended until December 31, 1968.

Cyclops timely filed a consolidated United States corporation income tax return for the year 1965 with the District Director of Internal Revenue at Pittsburgh, reflecting a total tax liability for the year in the amount of $6,416,008, all of which has been paid.

Cyclops, in the 1965 return, claimed deductions as ordinary and necessary business expenses under section 162 of the Internal Revenue Code of 1954, as amended, in the amount of $314,891 representing the total monthly obligations, including additional delayed contributions, accrued by Cyclops under the 1962 Universal-Cyclops and Empire-Reeves SUB plans during the year 1965.

A deficiency in consolidated income tax, together with interest, for the year 1965 was assessed against and paid by Cyclops based upon the partial disallowance of the claimed deductions of the monthly obligations, including additional delayed contributions, accrued under the 1962 Universal-Cyclops SUB plan during

the calendar year 1965 in the amount of $184,040 (the difference between the total amount accrued for the monthly obligations thereunder, including additional delayed contributions, and the amount paid to the Universal-Cyclops SUB trust for that year), and the amount of $68,163 of splashback transferred from the 1964 Universal-Cyclops S & V plan for the year.

A timely claim for refund for the year 1965 was filed on June 12, 1970 with the District Director of Internal Revenue at Pittsburgh for a refund of income tax in the amount of $121,057 for the year, together with interest paid, plus interest from the date of payment according to law.

Prior to the commencement of this action, more than 6 months had elapsed after the filing of the claim for refund without Cyclops having received the notice described in section 6532(a)(1) of the Internal Revenue Code of 1954, as amended.

Cyclops timely filed a United States corporation income tax return for the year 1966 with the District Director of Internal Revenue at Pittsburgh, reflecting a total tax liability for the year in the amount of $6,330,793, all of which has been paid.

Cyclops, in its 1966 return, claimed deductions as ordinary and necessary business expenses under section 162 of the Internal Revenue Code of 1954, as amended, in the amount of $376,573 representing the total monthly obligations, including additional delay contributions, accrued by Cyclops under the 1962 Universal-Cyclops and Empire-Reeves SUB plan during 1966.

A deficiency in income tax, together with interest, for 1966 was assessed against and paid by Cyclops, based upon the partial disallowance of the claimed deductions of the monthly obligations, including additional delayed contributions, accrued under the 1962 Universal-Cyclops SUB plan during 1966 in the amount of $256,622 (the difference between the total amount accrued as the monthly obligations thereunder, including additional delayed contributions, and the amount paid to the Universal-Cyclops SUB trust for that year), and the amount of $177,890 of splashback transferred from the 1964 Universal-Cyclops S & V plan for the year.

A timely claim for refund for the year 1966 was filed on June 12, 1970 with the District Director of Internal Revenue at Pittsburgh for a refund of tax in the amount of $208,566 for the year, together with interest paid, plus interest from the date of payment according to law. Prior to the commencement of this action, more than 6 months had elapsed after the filing of the claim without Cyclops having received the notice described in section 6532(a)(1) of the Internal Revenue Code of 1954, as amended.

From the period commencing January 1, 1969 to the present, the revised SUB plans, as amended, the 1964 Universal-Cyclops S & V plan, as amended, and the extended vacation benefit plans remained in full force and effect without material change except for the rate of funding and, with respect to Universal-Cyclops, the elimination commencing in 1972 of inter-related finances between its SUB plan and its S & V plan, all by virtue of separate collective bargaining agreements with the Union.

Universal-Cyclops and Empire-Reeves for each of the years 1962 to 1966, inclusive, and Reeves Steel for the year 1962 and part of 1963, furnished to the Union monthly reports of the financial condition of their respective SUB plans. By agreement with the Union in 1963, Reeves Steel ceased to furnish the reports.

Universal-Cyclops and Empire-Reeves for the years 1962 to 1964, inclusive, and Cyclops for the years 1965 and 1966 consistently treated and reported the amounts of their monthly obligations, including the additional delayed contributions, and the amounts restored and carried over from the 1956 and 1960 SUB plans, as an accrued expense and/or accrued liability in their books of account, published financial statements

and financial statements incorporated as part of their annual reports filed with the Securities and Exchange Commission.

During the period from 1957 to 1972, the following amount of cash unemployment benefits were paid to employees from the trusts established under the several SUB plans adopted by Universal-Cyclops, Empire-Reeves, and Reeves Steel:

| Calendar Year | Universal-Cyclops | Empire-Reeves | Reeves Steel |
|---|---|---|---|
| 1957 | $ 18,000 | N/A | N/A |
| 1958 | 358,000 | N/A | N/A |
| 1959 | 25,000 | N/A | N/A |
| 1960 | 191,000 | N/A | N/A |
| 1961 | 229,000 | N/A | N/A |
| 1962 | 135,000 | $ 1,000 | — |
| 1963 | 190,000 | 3,000 | — |
| 1964 | 24,000 | 1,000 | — |
| 1965 | 12,000 | 2,000 | — |
| 1966 | 5,000 | 17,000 | — |
| 1967 | 170,000 | 7,000 | — |
| 1968 | 207,000 | 5,000 | — |
| 1969 | 58,000 | 8,000 | — |
| 1970 | 151,000 | 27,000 | $1,000 |
| 1971 | 508,000 | 63,000 | 5,000 |
| 1972 | 133,000 | 19,000 | 2,000 |
| Total | $2,414,000 | $153,000 | $8,000 |

The amount of the monthly obligations under the 1962 Universal-Cyclops SUB plan, including the current contribution, the delayed contribution and the additional delayed contribution elements thereof, was derived from detailed monthly calculations based on actual contributory hours worked by its employees, the exact dollar amount of total finances, and the precise contribution rates set forth in said plan.

Beginning with the month of September, 1962 and continuing thereafter, all unemployment benefits payable to employees under the 1962 Universal-Cyclops SUB plan from its SUB trust were financed solely through delayed contributions and additional delayed contributions and none was financed through current contributions.

All unemployment benefits payable to employees under the 1962 Empire-Reeves SUB plan for its SUB trust were financed solely through delayed contributions and additional delayed contributions and none was financed through current contributions.

Based upon actual cash contributions by Universal-Cyclops into its SUB trust for the purpose of financing unemployment benefits under the 1962 Universal-Cyclops SUB plan, the contingent liability carry-forward as of June 30, 1962 from the 1956 Universal-Cyclops SUB plan which was accrued as a delayed contribution under the 1962 SUB plan in the amount of $403,000 was completely paid out on a first-in first-out basis by 1967, a period of approximately 5 years from the date of accrual. Over 50 percent of the carry-forward was paid out by the end of 1963, a period of 1½ years. Based upon the same facts, except that the period of elapsed years is weighted to reflect the percentage of cash contributions to the SUB trust made in each of the 5 years, the $403,000 contingent liability carry-forward was completely paid out in a period of 3.05 years.

Based upon actual cash contributions by Universal-Cyclops into its SUB trust for the purpose of financing unemployment benefits, the delayed contributions which were accrued under the 1962 Universal-Cyclops SUB plan between July 1, 1962 and December 31, 1970 (exclusive of the contingent liability carry-forward) was completely paid out on a first-in first-out basis over the following periods:

| Year of Accrual | Year of Final Payment | Total Elapsed Years |
|---|---|---|
| 1962 (July 1–Dec. 31) | 1968 | 6 |
| 1963 | 1970 | 7 |
| 1964 | 1970 | 6 |
| 1965 | 1971 | 6 |
| 1966 | N/A | N/A |
| 1967 | 1971 | 4 |
| 1968 | 1971 | 3 |
| 1969 | 1971 | 2 |
| 1970 | 1972 | 2 |

Based upon the same facts set forth above, except that the period of elapsed years is weighted to reflect the percentage of cash contributions to the SUB trust made in each of the years of payment, the delayed contributions were

completely paid out over the following periods:

| Year of Accrual | Total Elapsed Years |
|---|---|
| 1962 (July 1–Dec. 31) | 5.74 |
| 1963 | 6.00 |
| 1964 | 6.00 |
| 1965 | 5.39 |
| 1966 | N/A |
| 1967 | 4.00 |
| 1968 | 3.00 |
| 1969 | 2.00 |
| 1970 | 1.01 |

Based upon actual cash contributions by Universal-Cyclops into its SUB trust for the purpose of financing unemployment benefits, the delayed contributions which were accrued under the 1962 Universal-Cyclops SUB plan, between July 1, 1962 and December 31, 1970 (including the contingent liability carry-forward from the 1956 SUB plan) were completely paid out on a first-in first-out basis on a weighted average basis in a period of 3.88 elapsed years.

Based upon actual cash steelworker benefits financed with additional delayed contributions accrued by Universal-Cyclops under its 1962 SUB plan (exclusive of the 1 cent evaporation), said additional delayed contributions which were accrued between January 1, 1964 and December 31, 1968 were completely liquidated on a first-in first-out basis over the following periods:

| Year of Accrual | Year of Final Payment | Total Elapsed Years |
|---|---|---|
| 1964 | 1968 | 4 |
| 1965 | 1968 | 3 |
| 1966 | 1971 | 5 |
| 1967 | 1971 | 4 |
| 1968 | 1972 | 4 |

Based upon the same facts set forth in the above paragraph, except that the period of elapsed years is weighted to reflect the percentage of cash benefits made in each of the years of payment, the additional delayed contributions were completely liquidated on a first-in first-out basis over the following years:

| Year of Accrual | Total Elapsed Years |
|---|---|
| 1964 | 4.00 |
| 1965 | 3.00 |
| 1966 | 3.48 |
| 1967 | 4.00 |
| 1968 | 3.50 |

On a weighted average basis, the additional delayed contributions were completely liquidated in a period of 3.49 elapsed years.

Based upon actual cash steelworker benefits financed with additional delayed contributions accrued by Empire-Reeves under its 1962 SUB plan, said additional delayed contributions which were accrued between February 1, 1963 and December 31, 1969 were completely liquidated on a first-in first-out basis over the following periods:

| Year of Accrual | Year of Final Payment | Total Elapsed Years |
|---|---|---|
| 1963 (Feb. 1–Dec. 31) | 1964 | 1 |
| 1964 | 1965 | 1 |
| 1965 | 1966 | 1 |
| 1966 | 1969 | 3 |
| 1967 | 1970 | 3 |
| 1968 | 1971 | 3 |
| 1969 | 1972 | 3 |

Based upon the same facts set forth above, except that the period of elapsed years is weighted to reflect the percentage of cash benefits made in each of the years of payment, the additional delayed contributions were completely liquidated on a first-in first-out basis over the following years:

| Year of Accrual | Total Elapsed Years |
|---|---|
| 1963 | 1.00 |
| 1964 | .29 |
| 1965 | .56 |
| 1966 | .78 |
| 1967 | 2.46 |
| 1968 | 2.62 |
| 1969 | 2.84 |

On a weighted average basis, the additional delayed contributions were completely liquidated in a period of 1.57 elapsed years.

Based upon a projection of the experience by Universal-Cyclops under its 1956 SUB plan during the period of 1958 through 1963, including actual manhours worked and unemployment benefits paid, Universal-Cyclops could have reasonably expected on July 1, 1962 that the delayed contributions which were to be ac-

crued under the 1962 Universal-Cyclops SUB plan during a four-year period, including the contingent liability carry-forward under its 1956 SUB plan, and excluding additional delayed contributions, would have been completely paid into its SUB trust to pay unemployment benefits on a first-in first-out weighted basis in the following number of years:

| Year of Accrual | Total Elapsed Years |
| --- | --- |
| Balance at June 30, 1962 | 1.4 |
| Year No. 1 | 2.5 |
| Year No. 2 | 2.6 |
| Year No. 3 | 3.0 |

Universal-Cyclops and the Union agreed in 1968 to cancel the "evaporation" obligation in the amount of $182,924.58. The plaintiff in its 1968 federal income tax return reflected the cancelled $183,000 on Schedule M.